# United States Court of Appeals
## For the First Circuit

No. 13-2128

DENISE MERRIMON and BOBBY S. MOWERY,

Plaintiffs, Appellees,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

Defendant, Appellant.

No. 13-2168

DENISE MERRIMON and BOBBY S. MOWERY,

Plaintiffs, Appellants,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Torruella and Selya, Circuit Judges,
and McAuliffe,* District Judge.

---

*Of the District of New Hampshire, sitting by designation.

Donald R. Frederico, with whom Catherine R. Connors, Byrne J. Decker, Gavin G. McCarthy, and Pierce Atwood LLP were on brief, for defendant.

James F. Jorden, Waldemar J. Pflepsen, Jr., Michael A. Valerio, Ben V. Seessel, John C. Pitblado, Jorden Burt LLP, and Lisa Tate on brief for American Council of Life Insurers, amicus curiae.

Jeremy P. Blumenfeld, Morgan, Lewis & Bockius LLP, J. Michael Weston, and Lederer Weston Craig on brief for Defense Research Institute, amicus curiae.

John C. Bell, Jr., with whom Lee W. Brigham, Bell & Brigham, Stuart T. Rossman, Arielle Cohen, National Consumer Law Center, M. Scott Barrett, and Barrett Wylie LLC were on brief, for plaintiffs.

---

July 2, 2014

---

**SELYA, Circuit Judge.** In 1974, Congress enacted the Employee Retirement Income Security Act (ERISA). Pub. L. No. 93-406, 88 Stat. 829, codified as amended at 29 U.S.C. §§ 1001-1461. One of ERISA's principal goals is to afford appropriate protection to employees and their beneficiaries with respect to the administration of employee welfare benefit plans. See Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361-62 (1980). As is true of virtually any prophylactic statute, interpretive questions lurk at the margins. This class action, which arises out of an insurer's redemption of claims on ERISA-regulated life insurance policies through the establishment of retained asset accounts (RAAs), spawns such questions.

Here, the plaintiffs challenge the insurer's use of RAAs as a method of paying life insurance benefits in the ERISA context. They presented the district court with two basic questions. First, did the insurer's method of paying death benefits in the form of RAAs constitute self-dealing in plan assets in violation of ERISA section 406(b)? Second, did this redemption method offend the insurer's duty of loyalty toward the class of beneficiaries in violation of ERISA section 404(a)? The district court answered the first question in favor of the insurer and the second in favor of the plaintiff class. It proceeded to award class-wide relief totaling more than $12,000,000.

Both sides appeal.  We agree with the district court that the insurer's use of RAAs in the circumstances of this case did not constitute self-dealing in plan assets.  We disagree, however, with the district court's answer to the second query and hold that the insurer's use of RAAs did not breach any duty of loyalty owed by the insurer to the plaintiff class.  Accordingly, we affirm in part and reverse in part.

## I.  BACKGROUND

We briefly rehearse the relevant facts, which are largely undisputed.  Readers who hunger for more exegetic detail may consult the district court's fulsome rescript.  See Merrimon v. Unum Life Ins. Co., 845 F. Supp. 2d 310, 312-15 (D. Me. 2012).

The plaintiffs, Denise Merrimon and Bobby S. Mowery, represent a class of beneficiaries of ERISA-regulated employee welfare benefit plans funded by certain guaranteed-benefit group life insurance policies that the defendant, Unum Life Insurance Company of America (the insurer), issued.[1]  In 2007, each named plaintiff submitted a claim for life insurance benefits.  After reviewing the submissions, the insurer approved the claims.

The insurer redeemed the claims by establishing, through a contractor, accounts for the named plaintiffs at State Street Bank and credited to each plaintiff's account the full amount of

---

[1]  Although the decedents' employers were the named administrators of the plans, each of them delegated to the insurer discretionary authority to make claim determinations.

-4-

the benefits owed: $51,000 to Merrimon and $62,300 to Mowery. At the same time, the insurer mailed books of drafts to the plaintiffs, along with informational materials regarding the accounts. The drafts empowered the plaintiffs to withdraw all or any part of the corpus of the RAAs; provided, however, that each withdrawal was in an amount not less than $250.

In short order, the plaintiffs fully liquidated their RAAs and the accounts were closed. During the time that funds remained in their RAAs, however, the insurer retained the credited funds in its general account and paid the plaintiffs interest at a rate of one percent (substantially less, the plaintiffs allege, than the return the insurer earned on its portfolio).

The closing of the RAAs did not end the matter. In October of 2010, the plaintiffs filed a putative class action complaint in the United States District Court for the District of Maine. Their complaint alleged that the insurer's method of redeeming their claims violated ERISA sections 404(a) and 406(b), 29 U.S.C. §§ 1104(a), 1106(b), and sought "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3).[2] Following discovery, the parties cross-moved for summary judgment and the plaintiffs moved for class certification. The district court granted partial summary judgment in favor of the insurer on the plaintiffs' section

_____

[2] The complaint also advanced supplemental claims under Maine law. The district court dismissed those claims, and the plaintiffs have not attempted to renew them on appeal.

406(b) claims and granted partial summary judgment in favor of the plaintiffs on their section 404(a) claims. See Merrimon, 845 F. Supp. 2d at 327-28. The court then certified the plaintiff class. See id. The insurer moved to reconsider the adverse summary judgment and class certification rulings, but the district court doubled down: it both denied the motion and struck it as untimely.

A bench trial ensued to determine the appropriate measure of relief based on the district court's determination (on partial summary judgment) that the insurer had violated section 404(a). When all was said and done, the court awarded the plaintiff class monetary relief in excess of $12,000,000 (exclusive of prejudgment interest). Neither side was overjoyed, and these cross-appeals followed.

## II. JURISDICTION

The insurer argues, albeit conclusorily, that the plaintiffs lack constitutional standing to pursue their claims. One of the amici helpfully develops the argument in significantly greater detail. Although these circumstances might ordinarily give rise to questions of waiver, see, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that issues briefed in a perfunctory manner are normally deemed abandoned); Lane v. First Nat'l Bank, 871 F.2d 166, 175 (1st Cir. 1989) (explaining that a court will usually disregard issues raised only by amici and not by parties), no such obstacle exists here. The presence or absence of

-6-

constitutional standing implicates a federal court's subject-matter jurisdiction. When an issue implicates subject-matter jurisdiction, a federal court is obliged to resolve that issue even if the parties have neither briefed nor argued it. See Arizonans for Official English v. Arizona, 520 U.S. 43, 73 (1997); In re Sony BMG Music Entm't, 564 F.3d 1, 3 (1st Cir. 2009).

The Constitution carefully confines the power of the federal courts to deciding cases and controversies. See U.S. Const. art. III, § 2; Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013). "A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)); see Muskrat v. United States, 219 U.S. 346, 361-62 (1911). In order to make such a showing, "a plaintiff must establish each part of a familiar triad: injury, causation, and redressability." Katz, 672 F.3d at 71 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

The pivotal question here involves the injury in fact requirement. The best argument for the absence of constitutional standing is the notion that the plaintiffs did not suffer any

demonstrable financial loss as a result of the insurer's alleged transgressions and, therefore, did not sustain any injury in fact. Put another way, the argument is that because the plaintiffs received everything to which they were entitled under the ERISA plans, they suffered no actual harm.

This argument is substantial. When confronted with essentially the same question, the Second Circuit bypassed it and asserted jurisdiction on other grounds. See Faber v. Metro. Life Ins. Co., 648 F.3d 98, 102-03 (2d Cir. 2011). The Third Circuit rejected the argument in a divided opinion. See Edmonson v. Lincoln Nat'l Life Ins. Co., 725 F.3d 406, 415-17 (3d Cir. 2013), cert. denied, 134 S. Ct. 2291 (2014); id. at 429-33 (Jordan, J., dissenting). After careful perscrutation, we hold that the plaintiffs have constitutional standing.

An injury in fact is defined as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (footnote omitted) (internal citations and quotation marks omitted). But in order to establish standing, a plaintiff does not need to show that her rights have actually been abridged: such a requirement "would conflate the issue of standing with the merits of the suit." Aurora Loan Servs., Inc. v. Craddieth, 442 F.3d 1018, 1024 (7th Cir. 2006). Instead, a plaintiff need only show that she has "a colorable claim to such a

-8-

right." Id. (emphasis omitted). The evaluation of whether such a showing has been made must take into account the role of Congress. After all, Congress has the power to define "the status of legally cognizable injuries." Katz, 672 F.3d at 75.

These principles are dispositive here. Congress has mandated ERISA fiduciaries to abide by certain strictures and has granted ERISA beneficiaries corresponding rights to sue for violations of those strictures. See 29 U.S.C. § 1132(a)(3) (authorizing beneficiaries to sue "to obtain . . . appropriate equitable relief" in order "to redress . . . violations" of ERISA). An ERISA beneficiary thus has a legally cognizable right to have her plan fiduciaries perform those duties that ERISA mandates.

We hasten to add a caveat. It is common ground that Congress cannot confer standing beyond the scope of Article III. See Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."). This means, of course, that an insurer's violation of an ERISA-imposed fiduciary duty does not necessarily confer standing on all plan beneficiaries: a beneficiary must show that the alleged violation has worked some "personal and tangible harm" to her. Hollingsworth, 133 S. Ct. at 2661.

Here, however, the plaintiffs make colorable claims that they have suffered just such a harm. They contend that the insurer

has wrongfully retained and misused their assets.  If proven, this would constitute a tangible harm even if no economic loss results.  See, e.g., Restatement (Third) of Restitution and Unjust Enrichment § 3 reporter's note a (2011) ("[T]here can be restitution of wrongful gain in cases where the plaintiff has suffered an interference with protected interests but no measurable loss whatsoever."); see also CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1881 (2011).  In addition, the injury — although common to a potentially wide class of beneficiaries — is particularized to the plaintiffs, each of whom claims that the insurer wrongfully retained his or her assets.

The Supreme Court has "often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider."  Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 274 (2008).  Although ERISA is of relatively recent origin, its administration is informed by the common law of trusts.  See Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).  Historically, courts have asserted jurisdiction over cases against a trustee "even though the trust itself ha[d] suffered no loss."  George G. Bogert et al., Law of Trusts and Trustees § 861 (2013) (citing Mosser v. Darrow, 341 U.S. 267, 272-73 (1951); Magruder v. Drury, 235 U.S. 106, 120 (1914)); see also Restatement (Third) of Restitution and Unjust Enrichment § 3 reporter's note a (2011).  A holding here that the plaintiffs have

-10-

satisfied the requirements for constitutional standing would be entirely consistent with this historical practice.

To say more about the issue of constitutional standing would be to paint the lily.  We hold that the plaintiffs have asserted colorable and cognizable claims of injuries in fact. Nothing more is needed here, from a jurisdictional standpoint, to wrap the plaintiffs in the cloak of constitutional standing.[3]

## III.  THE MERITS

The district court made two pertinent liability rulings at the summary judgment stage.  One of these is challenged by the plaintiffs and the other by the insurer.  We review both rulings de novo.  See Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008).  Before addressing these rulings, however, we must resolve a threshold issue: whether deference is due to the relevant views of the United States Department of Labor (DOL).  We start there.

---

[3] In its opening brief, the insurer suggests that the plaintiffs lack statutory standing under ERISA.  Statutory standing is, of course, different than constitutional standing. See Katz, 672 F.3d at 75; Graden v. Conexant Sys. Inc., 496 F.3d 291, 295 (3d Cir. 2007).  One way in which the two concepts differ is that arguments based on statutory standing, unlike arguments based on constitutional standing, are waivable.  See, e.g., Bilyeu v. Morgan Stanley Long Term Disab. Plan, 683 F.3d 1083, 1090 (9th Cir. 2012), cert. denied, 133 S. Ct. 1242 (2013).  Any possible defect in statutory standing has been waived in this case because the issue was not raised below.  See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

-11-

## A. **The DOL Guidance**.

The Second Circuit, puzzling over essentially the same riddle that confronts us today, asked the DOL to provide its interpretation of how the relevant ERISA provisions affect insurers' decisions to use RAAs as a method of claim redemption. See Faber, 648 F.3d at 102. The DOL responded by submitting a 16-page amicus brief. See Secretary of Labor's Amicus Curiae Letter Brief in Response to the Court's Invitation (the DOL Guidance), Faber, 648 F.3d at 98 (No. 09-4901). In it, the DOL, after sedulous analysis, made it crystal clear that an insurer discharges its fiduciary duties under ERISA by furnishing a beneficiary unfettered access to an RAA in accordance with plan terms and does not retain plan assets by holding and managing the funds that back the RAA.

The insurer, citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), exhorts us to defer to the DOL Guidance. The plaintiffs demur, arguing that the DOL Guidance was hastily prepared and is inconsistent with other authority.

It is important to note that the DOL "shares enforcement responsibility for ERISA." John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 107 n.14 (1993) (citing 29 U.S.C. § 1204(a)). This responsibility paves the way for — but does not require — a finding that some deference is due to the DOL's views. An agency's interpretation of a statute that it

administers may warrant judicial deference, depending on the degree to which the agency's exposition of the issue is deemed authoritative. See United States v. Mead Corp., 533 U.S. 218, 228 (2001).

While agencies are generally presumed to have particular expertise with respect to the statutes that they administer, agencies speak in a variety of ways. As a result, authoritativeness often depends, at least in part, on context. For example, when an agency speaks with the force of law, as through a binding regulation, its interpretation of ambiguous provisions of a statute that falls within its purview is due judicial deference as long as that interpretation is reasonable. See id. at 229-30; Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984).

But when an agency speaks with something less than the force of law, its interpretations are entitled to deference "only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) (quoting Skidmore, 323 U.S. at 140). That is the situation here. We must, therefore, dig deeper.

To gauge persuasiveness, an inquiring court should look to a "mix of factors" that "either contributes to or detracts from the power of an agency's interpretation to persuade." Doe v. Leavitt, 552 F.3d 75, 81 (1st Cir. 2009). Those factors include

"the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of its interpretation] with earlier and later pronouncements." Id. (alterations in original) (quoting Skidmore, 323 U.S. at 140). "[T]he most salient of the factors that inform an assessment of persuasiveness [is] the validity of the agency's reasoning." Id. at 82.

We appraise the DOL Guidance with these factors in mind. In doing so, we are acutely aware that if this inquiry is to have any real utility, it must involve something more than merely determining whether the agency's views comport with the court's independent interpretation of the relevant statutory provisions. See id. at 80-81. If the relevant factors tilt in favor of giving weight to the agency's views, it would be an exercise in vanity for a court to disregard those views.

The DOL Guidance is plainly well-reasoned. Here, as in Doe, "the agency has consulted appropriate sources, employed sensible heuristic tools, and adequately substantiated its ultimate conclusion." Id. at 82. The meticulous nature of the agency's statement of its views, coupled with the logic of its position, combine to lend the DOL Guidance credibility.

To be sure, the DOL Guidance was not forged through a transparent and structured process, nor was it tempered in the crucible of public comment. Such accouterments would have given

-14-

added heft to the DOL Guidance — but none of them is a condition precedent to deference. See Sun Capital Partners III, LP. v. New Eng. Teamsters & Trucking Indus. Pension Fund, 724 F.3d 129, 140-41 (1st Cir. 2013), cert. denied, 134 S. Ct. 1492 (2014); Conn. Office of Prot. & Advocacy for Pers. with Disabs. v. Hartford Bd. of Educ., 464 F.3d 229, 239-40 (2d Cir. 2006) (Sotomayor, J.). Persuasiveness (or the lack of it) depends on the totality of the relevant factors.

So, too, the fact that the DOL's position is of relatively recent vintage is not fatal. While the longstanding nature of an agency interpretation may constitute an added reason for deference, see Lapine v. Town of Wellesley, 304 F.3d 90, 106 (1st Cir. 2002), new interpretations — particularly new interpretations addressing questions not previously posed to the agency — can be convincing, see, e.g., Conn. Office of Prot. & Advocacy, 464 F.3d at 244; In re New Times Sec. Servs., Inc., 371 F.3d 68, 81-83 (2d Cir. 2004).

In the last analysis, we are satisfied that the considerations of process and duration stressed by the plaintiffs are insufficient to sully the well-reasoned DOL Guidance. The amicus brief filed by the DOL bears the hallmarks of reliability. There is no good reason to dismiss it, especially since the agency was not a party to the litigation in which the amicus brief was filed but articulated its views only in response to the Second

Circuit's direct request.  See Conn. Office of Prot. & Advocacy, 464 F.3d at 236, 239-40.  Taking into account the scrupulousness of the DOL Guidance, its analytic rigor, and its crafting of a set of clear and easily applied rules that are consistent with ERISA's structure, text, and purpose, we conclude that the DOL Guidance is deserving of some weight.  See Martin v. OSHRC, 499 U.S. 144, 157 (1991).

## B.  Section 406(b).

The plaintiffs' remaining contention is that the insurer's method of redeeming life insurance policies by paying death benefits in the form of RAAs constituted self-dealing in plan assets in violation of ERISA section 406(b).  ERISA section 406(b) prohibits a plan fiduciary from "deal[ing] with the assets of the plan in [its] own interest or for [its] own account."  29 U.S.C. § 1106(b)(1).  The plaintiffs assert that the insurer violated this prohibition on self-dealing in plan assets by retaining and investing RAA funds for its own enrichment.  The district court rejected this assertion, see Merrimon, 845 F. Supp. 2d at 319, and so do we.

ERISA nowhere contains a comprehensive definition of what constitutes "plan assets."  See Harris Trust, 510 U.S. at 89.  In an effort to fill this void, the DOL consistently has stated that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law."  U.S.

-16-

Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993). Several of our sister circuits have adopted this formulation. See, e.g., Edmonson, 725 F.3d at 427; Faber, 648 F.3d at 105-06; Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007); In re Luna, 406 F.3d 1192, 1199 (10th Cir. 2005). We too find this formulation persuasive.

The plaintiffs concede that, prior to the creation of an RAA, funds held in the insurer's general account are not plan assets. That is because

> [i]n the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2).

The plaintiffs nonetheless posit that when a death benefit accrues and is redeemed by means of the establishment of an RAA, the RAA funds become plan assets if those funds are retained in the insurer's general account. As a corollary, they posit that those retained funds remain plan assets until the RAA is fully liquidated.

This argument lacks force. There is no basis, either in the case law or in common sense, for the proposition that funds held in an insurer's general account are somehow transmogrified into plan assets when they are credited to a beneficiary's account.

Indeed, the DOL Guidance — to which a modicum of respect is owed — indicates exactly the opposite.  See DOL Guidance at 7.

We add, more generally, that ordinary notions of property rights counsel strongly against the plaintiffs' proposition.  It is the beneficiary, not the plan itself, who has acquired an ownership interest in the assets backing the RAA.  See Edmonson, 725 F.3d at 428; Faber, 648 F.3d at 106.  Unless the plan documents clearly evince a contrary intent — and here they do not — a beneficiary's assets are not plan assets.

The decision in Mogel v. Unum Life Insurance Co., 547 F.3d 23, 26 (1st Cir. 2008), is not at odds with the conclusion that the monies retained by the insurer are not plan assets.  Mogel involved a plan that contained a specific directive to pay beneficiaries in a lump sum.  See id. at 25.  The insurer ignored this specific directive and sought instead to redeem claims through the establishment of RAAs.  See id.  As has been widely recognized, this particularized policy provision explains this court's holding that the insurer, which had not paid the policy proceeds in a manner permitted by the plan documents, had violated its fiduciary duties.  See Edmonson, 725 F.3d at 428; Faber, 648 F.3d at 106-07; DOL Guidance at 13-14.  Thus, neither the holding in Mogel nor its broadly cast language is binding precedent for purposes of this materially different case.  See Mun'y of San Juan v. Rullan, 318 F.3d 26, 28 n.3 (1st Cir. 2003) (explaining that "[d]icta comprises

-18-

observations in a judicial opinion . . . that are 'not essential' to the determination of the legal questions then before the court," and that dicta "have no binding effect in subsequent proceedings").

As a fallback, the plaintiffs invite us to adopt the Ninth Circuit's functional approach to determining which assets are plan assets. See Acosta v. Pac. Enters., 950 F.2d 611, 620 (9th Cir. 1991). The functional approach looks to "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries" as a means of ascertaining whether the item is a plan asset. Id. Although courts occasionally have found this approach useful, we have never endorsed it. Nor do we need to explore its possible utility today: while the functional approach might be of some assistance in doubtful cases, the assets with which we are concerned — the funds backing the RAAs — fall squarely within the compass of section 401(b)(2) prior to the establishment of an RAA, and they are not governed by ERISA subsequent thereto. As the DOL Guidance makes manifest, those funds are simply not plan assets.

The plaintiffs have one final shot in their sling. They say that even if the court below appropriately determined that the retained funds were not plan assets, its ultimate conclusion that the insurer did not offend section 406(b) was nevertheless incorrect. This is so, the plaintiffs' thesis runs, because the life insurance policies themselves were plan assets and the insurer

-19-

exercised control respecting the management of the policies when it established the RAAs, retained and invested the RAA funds to its own behoof, and decided how much of the investment profit to keep and how much to pay in interest.

The insurer's first line of defense is that this claim was waived because it was not proffered below. The plaintiffs' disavowal points only to a single paragraph in their complaint. Standing alone, this solitary paragraph is too thin a reed by which to exorcize the evils of waiver. We explain briefly.

"Even an issue raised in the complaint but ignored at summary judgment may be deemed waived. If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) (internal quotation marks omitted). That is precisely what happened here. After filing their complaint, the plaintiffs did nothing to develop this particular claim, and the summary judgment papers disclose no development of it. The claim is, therefore, waived.

This brings us to the end of the road. We hold that the funds backing the plaintiffs' RAAs were not, and never became, plan assets. Consequently, the court below did not err in holding that there was no showing of self-dealing sufficient to ground a section 406(b) claim.

## C. **Section 404(a)**.

ERISA section 404(a) provides, with certain reservations not relevant here, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  Relatedly, ERISA stipulates that

> a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan.

Varity, 516 U.S. at 498 (quoting 29 U.S.C. § 1002(21)(A)).  The crux of the plaintiffs' section 404(a) claims is that the insurer acted as a fiduciary when setting the RAA interest rate and that it did not set the rate solely in the interest of the beneficiaries.

The district court found this claim persuasive.  The court premised its conclusion that the insurer was acting as a fiduciary on the insurer's retention of discretion both "to determine the interest rates and other features accruing to [the RAAs]" and "to award itself the business of administering the Plaintiffs' RAAs" while retaining the assets backing these accounts.  Merrimon, 845 F. Supp. 2d at 319-20.  With this premise in place, the court concluded that the insurer, as a fiduciary, "managed the RAAs to optimize its own earnings and not to optimize the beneficiaries' earnings."  Id. at 320.  It granted partial

-21-

summary judgment holding the insurer liable under ERISA section 404(a). See id.

The insurer mounts a formidable challenge to this holding. The centerpiece of its challenge is the assertion that, by establishing the RAAs in accordance with the plan documents, the insurer fully discharged its fiduciary duties. Consequently, the subsequent relationship between the insurer and the beneficiary was in the nature of a debtor-creditor relationship, governed not by ERISA but by state law. In other words, when the insurer invested the retained funds and paid interest to the beneficiaries, it was not acting as an ERISA fiduciary.

The insurer's position makes sense, and it is bulwarked by relevant authority. To begin, the DOL has stated explicitly that a life insurer discharges its fiduciary duties when it redeems a death-benefit claim through the establishment of an RAA as long as that method of redemption is called for by the plan documents. See DOL Guidance at 11. We owe a measure of deference to this view. See supra Part III(A). This deference is especially appropriate because the only two courts of appeals to have addressed the issue subsequent to the DOL's statement of its views have reached the same conclusion. See Edmonson, 725 F.3d at 424-26; Faber, 648 F.3d at 104-05.

The plaintiffs beseech us not to follow these authorities. Their variegated arguments sound two related themes.

First, they assert that the insurer continued to act as a fiduciary even after it established the RAAs because it continued to hold the policy proceeds in its general account.  Second, they assert that the insurer acted as a fiduciary in setting the interest rate because the plan documents stipulated no specific interest rate. We treat these arguments separately.

**1.  Retention of Policy Proceeds.**  It is clear beyond hope of contradiction that sponsors of ERISA plans have considerable latitude in plan design, including the establishment of methods for paying benefits.  See Faber, 648 F.3d at 104 (citing Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999)); see also Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). When ERISA deals with the payment of benefits, the term benefit "denotes the money to which a person is entitled under an ERISA plan."  Evans v. Akers, 534 F.3d 65, 70 (1st Cir. 2008) (internal quotation marks omitted).  Although fiduciary duties do encompass some acts connected to the distribution of plan benefits, see Mogel, 547 F.3d at 27, such fiduciary duties relate principally to ensuring that monies owed to beneficiaries are disbursed in accordance with the terms of the plan.

In this instance, each of the plans provides that the insurer will, upon proof of claim, pay the death benefit owed by "mak[ing] available to the beneficiary a **retained asset**

**account**"(emphasis in original).[4]  Each plan describes an RAA as "an interest bearing account established through an intermediary bank."  The insurer followed this protocol precisely: it made available to each plaintiff an interest-bearing RAA established through an intermediary bank, which was credited with the full amount of the death benefit owed.  No more was exigible to carry out the terms of the plans.

Once the insurer fulfilled these requirements, its duties as an ERISA fiduciary ceased.  See Edmonson, 725 F.3d at 425-26; Faber, 648 F.3d at 105; DOL Guidance at 11.  There is simply no basis for concluding that ERISA-imposed fiduciary duties remained velivolant after that point.  Cf. LaRocca v. Borden, Inc., 276 F.3d 22, 30 (1st Cir. 2002) (explaining that the purpose of ERISA is "to protect contractually defined benefits").  Any further obligation that the insurer had to the beneficiaries "constituted a straightforward creditor-debtor relationship."  Faber, 648 F.3d at 105; accord Edmonson, 725 F.3d at 426; DOL Guidance at 10-11.

The plaintiffs labor to dull the force of this reasoning.  They start by asseverating that the establishment of an RAA does not constitute payment of benefits.  But this asseveration rests chiefly on our decision in Mogel, 547 F.3d at 26; and as we already have explained, Mogel is inapposite here.  See supra Part III(B).

---

[4] The plans except death benefits totaling less than $10,000. That exception is not relevant here.

The plaintiffs also asseverate that, under general trust principles, "[e]ven when a trust terminates, the trustee's powers and duties continue until the trustee delivers the trust property to the persons entitled to it." Plaintiffs' Br. at 66. Here, however, the insurer paid the death benefits that were owed by delivering to the beneficiaries an instrument (the RAA) required by the terms of the plans. Under the plans, that delivery constituted delivery in full of the policy proceeds to the person(s) entitled to those proceeds. Therefore, the general trust principles relied on by the plaintiffs do not support their claim.

This analysis also explains why the plaintiffs' insistence that the insurer had to obtain the plaintiffs' informed consent before it invested the retained funds is without merit. This argument, too, is based on general trust principles; and the simple answer to it is that the insurer was not acting as a

fiduciary when it invested the retained funds.[5]  See Edmonson, 725 F.3d at 426.

> **2.  Setting of Interest Rate.**  This leaves the second theme sounded by the plaintiffs.  They contend that because the insurer retained discretion to set the interest rate to be paid on the RAAs, rate-setting was a fiduciary act, which the insurer did not carry out solely in the interest of the beneficiaries.  Cf. 29 U.S.C. § 1002(21)(A) (defining a plan fiduciary in terms of discretion).  The plaintiffs' reach exceeds their grasp. Discretionary acts trigger fiduciary duties under ERISA only when and to the extent that they relate to plan management or plan assets.  See id.; see also Varity, 516 U.S. at 498; Livick v. Gillette Co., 524 F.3d 24, 29 (1st Cir. 2008).  In the circumstances of this case, the setting of the interest rate did not relate to plan management but, rather, related to the

---

[5] The plaintiffs launch an array of other plaints based on DOL statements.  These statements deal, inter alia, with the practice of fiduciaries "earn[ing] interest from the 'float' that occurs between the time a benefits check is issued and the time it is cashed by the beneficiary," Plaintiffs' Br. at 69 (citing U.S. Dep't of Labor, Field Assistance Bull. 2002-3, 2002 WL 34717725, at *2-3 (Nov. 5, 2002); U.S. Dep't of Labor, Advisory Op. No. 92-24A, 1993 WL 349627, at *1-2 (Sept. 13, 1993)), and with fiduciaries who "provide[] record-keeping and related services to a defined contribution plan," id. at 70 (citing U.S. Dep't of Labor, Advisory Op. No. 2013-03A, 2013 WL 3546834, at *3-4 (July 3, 2013)).  These DOL statements are at best tenuously connected to the circumstances at hand.  Thus, they cannot trump the on-point views expressed in the DOL Guidance. Cf. United States v. Nascimento, 491 F.3d 25, 41 (1st Cir. 2007) (adopting authority "more directly on point"); United States v. Palmer, 946 F.2d 97, 99 (9th Cir. 1991) (similar).

management of the RAAs. The RAAs were not plan assets, see Faber, 725 F.3d at 106, and the setting of an interest rate for use in connection with the RAAs thus did not implicate any ERISA-related fiduciary duty, see Edmonson, 725 F.3d at 424 n.14; cf. DOL Guidance at 8 (indicating that the determination of whether the discretionary setting of an interest rate implicates ERISA depends in significant part on whether the interest-earning assets are plan assets).

This conclusion follows inexorably from our holding that the establishment of an RAA constitutes payment under the terms of the plans. When the insurer redeems a death benefit that is due a beneficiary by establishing an RAA, no other or further ERISA-related fiduciary duties attach. Thus, the insurer's setting of an interest rate for the RAAs does not implicate ERISA; rather, its setting of the interest rate must be viewed as part of the management of the RAAs, governed by state law.[6] See Edmonson, 725 F.3d at 425-26; Faber, 648 F.3d at 104-05; DOL Guidance at 11.

The Supreme Court's decision in Varity, loudly bruited by the plaintiffs, does not demand a contrary result. There, the Court was confronted with an employer that lied to its employees about the effect of a pending corporate reorganization on their

_____

[6] We are mindful that the district court characterized what happened here as the insurer "award[ing] itself the business of administering the Plaintiffs' RAAs." Merrimon, 845 F. Supp. 2d at 319. But this characterization is inapropos; the insurer did no more than carry out the express terms of the plans.

benefits.  See Varity, 516 U.S. at 493-94.  One issue was whether the employer, in communicating with its work force, was acting as an ERISA plan administrator or an employer.  See id. at 498.  In holding that the employer was acting in the former capacity, the Court noted that "[t]here is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime."  Id. at 504.

Like barnacles clinging to the hull of a sinking ship, the plaintiffs cling to these words.  Their reliance is mislaid.  Varity, which involved a plan administrator that "significantly and deliberately misled the beneficiaries," id. at 492, is plainly distinguishable.  The Court's acknowledgment that a plan administrator may have extra-textual fiduciary duties that are implicated in such parlous circumstances does not mean that those duties are implicated here.  Varity held that plan administration "includes the activities that are ordinary and natural means of achieving the objective of the plan," whether or not spelled out in the plan.  Id. (internal quotation marks omitted).  The objective of each of the plans at issue here was the delivery of a guaranteed death benefit to the beneficiary, and the delivery of the benefit through the establishment of an RAA fulfilled that objective.  No other or further fiduciary duties attached.

Let us be perfectly clear.  This case is not about the desirability, fairness, or social utility of retained asset

accounts.  It is, rather, about the boundaries of ERISA.  The plaintiffs attempt to invoke ERISA to attack practices that fall outside the compass of the ERISA statute.  Consequently, they are not entitled to relief.

## IV.  CONCLUSION

We need go no further.[7]  The plaintiffs have not made out their claims that the insurer breached any of its ERISA-related fiduciary duties.  Thus, we affirm the district court's order of partial summary judgment in favor of the insurer with respect to ERISA section 406(b) and reverse the district court's order of partial summary judgment in favor of the plaintiffs with respect to section 404(a).  Accordingly, the trial (which was devoted to potential relief) was a nullity and the resultant judgment must be vacated.  To conclude the matter, we remand to the district court with instructions to enter judgment in favor of the insurer.  All parties shall bear their own costs.

**So Ordered.**

---

[7] Inasmuch as we have resolved the liability issues adversely to the plaintiffs, the other issues that have been briefed and argued in connection with these appeals fall by the wayside. Without exception, those issues relate to relief, and we have determined that the plaintiffs are not entitled to any relief.