# United States Court of Appeals
## For the First Circuit

No. 15-1445

IN RE: FIDELITY ERISA FLOAT LITIGATION

TIMOTHY M. KELLEY, and all others similarly situated, et al.,

Plaintiffs, Appellants,

v.

FIDELITY MANAGEMENT TRUST COMPANY, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
and Kayatta, Circuit Judge.

Mark T. Johnson, with whom Todd M. Schneider, Joshua G. Konecky, Garrett W. Wotkyns, Michael C. McKay, Schneider Wallace Cottrell Konecky Wotkyns LLP, Joseph C. Peiffer, Daniel J. Carr, Peiffer Rosca Abdullah & Carr, Gregory Y. Porter, John J. Roddy, Elizabeth A. Ryan, Bailey & Glasser LLP, Suyash Agrawal, Jeannie Y. Evans, Agrawal Evans LLP, Branford S. Babbitt, Craig A. Rabbe, Elizabeth R. Leong, Danielle Andrews Long, Robinson & Cole LLP, Robert A. Izard, Jr., Mark P. Kindall, Izard Noble LLP, Peter J.

_____

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Mougey, Laura Dunning, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA, Richard S. Frankowski, The Frankowski Firm, Thomas G. Shapiro, Michelle H. Blauner, and Shapiro Haber & Urmy LLP were on brief, for appellants.

Jonathan D. Hacker, with whom Brian D. Boyle, Bradley N. Garcia, O'Melveny & Myers LLP, Joseph F. Savage, Jr., Alison V. Douglass, and Goodwin Procter LLP were on brief, for appellees.

Elizabeth Hopkins, Counsel for Appellate and Special Litigation, with whom M. Patricia Smith, Solicitor of Labor, G. William Scott, Associate Solicitor for Plan Benefits Security, and David Ellis, Trial Attorney, U.S. Department of Labor, were on brief, for the Secretary of Labor as amicus curiae supporting appellants.

—————————————

July 13, 2016

—————————————

**SOUTER**, **Associate Justice**.  This appeal is from the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) of a putative class action filed by retirement-plan participants and one plan administrator.  They claim that defendants are dealing with plan assets in breach of fiduciary duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829 (codified in relevant part as amended at 29 U.S.C. §§ 1001-1461).  We affirm.

## I

As preface, we mention two cases that we decided in 2014, to which this one bears partial resemblance.  In each of them, beneficiaries of life-insurance plans covered by ERISA filed putative class actions against the insurers.  Vander Luitgaren v. Sun Life Assur. Co. of Can., 765 F.3d 59 (1st Cir. 2014); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46 (1st Cir. 2014).  The plaintiffs alleged that the insurers breached their fiduciary duties by using plan assets to enrich themselves rather than to aid the beneficiaries.  We held to the contrary.

This case is different from those two, and not just because it involves investments to generate retirement benefits rather than life-insurance policies.  Unlike the beneficiaries who brought those two suits, the participants who bring this one claim no direct stake in the plan assets that they say are being improperly used and no consequential loss personal to them.  They

- 3 -

do not allege that they are or will be short so much as a penny of any benefit to which they are entitled under the terms of their plans. Instead, they bring claims on behalf of the plans themselves, contending that the plans are being cheated of certain plan assets. Given this posture, it is notable that the participants are joined as plaintiffs by only one plan administrator. Thus, whatever mischief the participants see in defendants' actions, the concern apparently is shared only halfheartedly by the plans themselves. That is likely because the behavior complained of is nothing other than what the plans expected.

The six plaintiff plan participants and the one plan administrator collectively represent eight 401(k) defined-contribution retirement plans.[1] Under ERISA, a "'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of

---

[1] Timothy M. Kelley was a participant in the Avanade, Inc. 401(k) Retirement Plan and the Hewlett-Packard Company 401(k) Plan; Jamie A. Fine is a participant in the Delta Airlines 401(k) Plan; Patricia Boudreau is a participant in the Bank of America 401(k) Plan; Alex Gray is a participant in the EMC Corporation 401(k) Plan; Bobby Negron is a participant in the Safety Insurance Company 401(k) Plan; Korine Brown is a participant in the General Motors Personal Savings Plan; and Columbia Air Services, Inc. is an administrator of the Columbia Group of Companies 401(k) Retirement Savings Plan.

accounts of other participants which may be allocated to such participant's account."  29 U.S.C. § 1002(34).

Defendants are various Fidelity entities that had trust agreements with the plans; following the parties' lead, we deal with defendants collectively as "Fidelity."[2]  Under the agreements, Fidelity acted as trustee, serving the plans, the mutual funds in which contributions were invested, and the participants and their designated beneficiaries.[3]  Among other things, Fidelity functioned, in effect, as an intermediary.  It opened and maintained a trust account for each plan and participant, accepted contributions from the participant or her employer, and invested those contributions in mutual funds.

At the other end of the process, and crucial to this case, Fidelity performed its intermediary functions in effecting withdrawals.  When a participant requested to withdraw from the plan, her mutual-fund shares were redeemed by the mutual fund's payment of money in an amount equal to the market value of the

---

[2]  Fidelity Management Trust Company holds assets for institutional clients; Fidelity Management & Research Company is an investment advisor; and Fidelity Investments Institutional Operations Company, Inc. is a transfer agent of Fidelity Management Trust Company for mutual funds.

[3] As this is an appeal from the dismissal of the action at the pleading stage, we present the facts as alleged in the operative complaint, the Second Amended Consolidated Complaint, and the documents it incorporates by reference. Hochendoner v. Genzyme Corp., ___ F.3d ___, Nos. 15-1446, 15-1447, 2016 WL 2962148, at *1 (1st Cir. May 23, 2016).

shares.  Because that value was not established until the end of each trading day, the redemption occurred the day after the withdrawal request, when the mutual fund transferred cash to a redemption bank account owned by and registered to Fidelity.  It is undisputed that, prior to the redemption, the cash was an asset of the mutual fund.  That same day, the balance was transferred from the redemption account to "FICASH," an interest-bearing account owned and controlled by Fidelity.  The next day, after remaining in FICASH overnight, the account's principal (but not any interest) was transferred back to the redemption account.  The participant then received an electronic disbursement from the redemption account if she had so elected.  If she had not chosen to receive an electronic disbursement, the funds were transferred from the redemption account to an interest-bearing disbursement account owned and controlled by Fidelity.  The disbursement account then issued the participant a check, and the principal in the disbursement account would accrue interest until the check was cashed.[4]

---

[4] For simplicity, we refer to the "participant" as receiving the payout.  Of course, under ERISA and the plan documents, payment could also be received by a "beneficiary."  See 29 U.S.C. § 1002(8) (defining "beneficiary" under ERISA); Sealed Supplemental Appendix at 109 (explaining, in plan document, that "[t]he [t]rustee shall hold the assets of the [t]rust [f]und for the exclusive purpose of providing benefits to [p]articipants and [b]eneficiaries").

This process may appear unnecessarily elaborate. Although Fidelity's position as an intermediary in the withdrawal process is well established under the trust agreements in place here, the entire role of the intermediary seemingly could be eliminated by making the disbursement from the mutual fund to the participant directly. Indeed, Fidelity informs us (and plaintiffs do not contest) that, in ordinary "retail" mutual-fund transactions, the fund's own transfer agent alone makes the disbursement, see Brief of Defendants-Appellees at 8, and there is no apparent reason that the retirement plans could not contract for similar arrangements. Similarly, some of the transfers between Fidelity accounts and the one-night stay in FICASH do not, superficially at least, seem necessary. But it appears that there is nothing bizarre about this sequence as a matter of ordinary business practice, and plaintiffs do not contend otherwise.

Whatever may be the practical merits of the system, there is no question that when Fidelity acts as intermediary in the withdrawal process under its trust agreements with the plans it is a fiduciary within the meaning of ERISA. Under section 3(21)(A)(i), "a person is a fiduciary with respect to a plan to the extent he . . . exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Section 404(a) of ERISA imposes a fiduciary duty of loyalty, that "a fiduciary . . . discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). And ERISA section 406(b) specifically prohibits a fiduciary from self-dealing, providing that "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

Plaintiffs allege that Fidelity breached these two fiduciary duties by using certain plan assets other than for the benefit of the plans, in its treatment of "float": interest earned on the cash paid out by the mutual funds.[5] As mentioned before, there were two points in the withdrawal sequence at which interest might be earned: when the cash was in FICASH overnight, and, for participants who opted to receive a paper check rather than an electronic transfer, when it sat in the disbursement account until the participant cashed her check.

As we also said, the suing participants do not claim a direct, personal stake in float, and at argument their counsel confirmed that they do not contend that any withdrawing participant received less than she was entitled to under the plan documents.

---

[5] There appears to be some flexibility in the industry's understanding of the meaning of "float." Other cases, for example, use the term to refer to the pool of cash paid out by the mutual fund upon redemption, and then use the distinct term "float interest" or "float income" to refer to the interest earned on that cash. Tussey v. ABB, Inc., 746 F.3d 327, 332 & n.4 (8th Cir. 2014). There is no question that the complaint in this case uses "float" to refer only to the interest, and we do the same.

Instead, plaintiffs' quarrel is over Fidelity's use of float other than for the benefit of the plans. The complaint alleges that Fidelity used float to defray bank expenses and, if there was any remainder, distributed it to the investment fund from which the principal came. Plaintiffs maintain that ERISA's fiduciary mandates required float to be credited instead to the plans, where, as counsel stated at argument, it would inure indirectly to the benefit of all participants.

A necessary step to reach this result, as plaintiffs have pleaded their causes of action in the complaint, is treatment of float as a plan asset, and their loss in the district court turned on the conclusion that the complaint did not allege facts to support this premise. Hence, the order granting Fidelity's motion to dismiss for failure to state a claim on which relief can be granted.[6]

## II

We review de novo the district court's dismissal of the complaint for failure to state a claim. Saldivar v. Racine, 818 F.3d 14, 17 (1st Cir. 2016).

> To survive a motion to dismiss, [a] complaint
> must contain sufficient factual matter to
> state a claim to relief that is plausible on

---

[6] The district court also concluded that, even if float were a plan asset, Fidelity was not acting as an ERISA fiduciary when dealing with float. Because we conclude that plaintiffs have not alleged facts showing that float should be treated as a plan asset, we need not address this alternative conclusion.

its face. In evaluating whether a complaint states a plausible claim, we perform a two-step analysis. At the first step, we distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited). At step two, we must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable.

Id. at 18 (citations, alterations, and internal quotation marks omitted).

Here, at step one, we need not credit the complaint's statement that float is a "plan asset," for that label represents a legal conclusion, not a factual assertion. It is, moreover, a legal conclusion bereft of any comprehensive definition in ERISA itself, as we have explained: "In an effort to fill this void, the [Department of Labor] consistently has stated that the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. . . . We . . . find this formulation persuasive." Merrimon, 758 F.3d at 56 (citations and internal quotations marks omitted).

Plaintiffs approach the question whether float should be treated as a plan asset by observing that, prior to redemption, the mutual-fund shares are plan assets. Thus, their argument goes, under ordinary notions of property rights, the cash received in redemption of those shares must also be a plan asset. And if that cash is a plan asset, so too is any interest earned on that cash.

- 10 -

This sequence might hold up if the payout from the redemption were going to the plan itself, as one side of a simple exchange transaction in which the place of plan assets consisting of mutual-fund shares would be filled by substitute cash of equal value. In that scenario, ordinary notions of property rights probably would dictate that the substitute cash becomes an asset of the plan upon the exchange.

But this is not what happens. The payout from the redemption does not go, and is not intended to go, to the plan itself. In fact, it appears that the plans are not entitled to hold uninvested cash, see Sealed Supplemental Appendix at 109 ("The [t]rust [f]und shall be fully invested . . . ."); id. at 109-10 ("[T]he [t]rustee shall have . . . power[] . . . to retain uninvested [only] such cash as the . . . [a]dministrator may . . . direct."), and a plan's instruction to redeem shares is therefore most coherently seen as an order to pay the participant, whose receipt of the dollar value of the shares is as clearly the object of the transfer scheme as it would be if the mutual fund were to pay the participant directly. Plaintiffs allege no facts to support the proposition that the same cash becomes a plan asset simply because it moves, not directly from the fund to the participant, but from the fund through Fidelity on its way to the participant.

It is true that Fidelity occupies its position in the withdrawal process by virtue of its fiduciary relationship with the plan. But this relationship, standing alone, is not a sufficient reason to think that it confers plan-asset status on everything that comes within Fidelity's possession. Now, if the cash were ultimately destined for the plan itself and Fidelity acted as an intermediary agent to receive the cash for deposit with the plan, plaintiffs' position would have some intuitive appeal. But, for the purpose of understanding Fidelity's obligation subject to ERISA, Fidelity is more straightforwardly viewed as an agent charged with transferring the cash from the fund to the participant outside the plan, not to the plan itself.

There is a further reason to see the agency this way. Because "ERISA's principal function is to protect . . . contractually defined benefits[,] . . . a fiduciary must act in accordance with the documents and instruments governing the plan." Vander Luitgaren, 765 F.3d at 64 (citation, alterations, and internal quotation marks omitted). Here, the agreements between Fidelity and the plans, cited in the complaint and attached to the motion to dismiss, confirm the foregoing analysis that Fidelity's duty is to make a distribution by a route incapable of providing any benefit to the plan from temporary use of the cash:

> Fidelity shall distribute withdrawals directly to each [p]articipant based upon the address of record unless distribution is

- 12 -

> processed as an electronic payment ("direct deposit") pursuant to Fidelity's receipt, in a form and manner acceptable to Fidelity, of [p]articipants['] bank account information. Fidelity will process all approved withdrawals and mail distribution checks, or remit distributions as direct deposits to [p]articipants within ten business days of the processing date.

Sealed Supplemental Appendix at 148. Nothing in this provision for direct distribution to a participant suggests that the plan is meant to exercise, or receive a benefit under, ordinary property rights in the traveling cash. There is no indication, for instance, that the plan bears the risk if the cash is lost after the redemption but before its receipt by the participant. Indeed, it appears that the plans would be, in effect, incapable of bearing such risk, for a reason mentioned before, that the agreements prevent plan trusts from holding any uninvested cash. Id. at 109-10. By contrast, Fidelity's mutual fund disclosures, publicly available documents to which Fidelity directs us and the authenticity of which plaintiffs do not contest, provide that the "fund faces the risk of loss . . . if the [intermediary] bank becomes insolvent." Brief of Defendants-Appellees at 28.

The reasonableness of this conclusion suggested by the structure of the withdrawal process and the parties' relationships is corroborated by our pair of insurance cases from 2014, Vander Luitgaren and Merrimon. Both were brought to challenge a particular benefit-payment method: The insurer would open a

retained asset bank account (RAA) in the beneficiary's name, credit the account with the full benefit amount, and mail the beneficiary a book of drafts for making withdrawals. During the time that the RAA had a positive balance, the insurer retained the credited funds in its general account and continued to collect a return on them. The insurer would pay the beneficiary some interest on the value of the RAA but at a rate allegedly lower than the return the insurer was receiving. The beneficiaries who brought the cases alleged that, by retaining and investing RAA funds for its own enrichment, the insurer violated both the ERISA section 404(a) duty of loyalty and the 406(b) prohibition against self-dealing. Vander Luitgaren, 765 F.3d at 61-62; Merrimon, 758 F.3d at 51.

Much as plaintiffs in this case acknowledge that, prior to a redemption, the cash is an asset of the mutual fund (not the plan), so too the beneficiaries in Merrimon conceded that, prior to the creation of an RAA, funds held in the insurer's general account were not plan assets. See Merrimon, 758 F.3d at 56; Compare 29 U.S.C. § 1101(b)(1) ("In the case of a plan which invests in any security issued by a[ mutual fund], the assets of such plan . . . shall not . . . be deemed to include any assets of such [mutual fund]."), with id. § 1101(b)(2) ("In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan . . . shall not . . . be deemed to include any assets of such insurer."). And much as plaintiffs here contend

- 14 -

that, upon redemption, the cash becomes a plan asset, so too the beneficiaries there posited that, "when a death benefit . . . is redeemed by means of the establishment of an RAA, the RAA funds become plan assets."  Merrimon, 758 F.3d at 56.  We rejected the argument in those cases:

> There is no basis, either in the case law or in common sense, for the proposition that funds held in an insurer's general account are somehow transmogrified into plan assets when they are credited to a beneficiary's account. . . .  [O]rdinary notions of property rights counsel strongly against the . . . proposition.  It is the beneficiary, not the plan itself, who has acquired an ownership interest in the assets backing the RAA.  Unless the plan documents clearly evince a contrary intent--and here they do not--a beneficiary's assets are not plan assets.

Id. (citations omitted); see also Vander Luitgaren, 765 F.3d at 63.  Thus, it is in harmony with those cases that we reject the comparable argument in this one, too.  Cash held by a mutual fund is not transmuted into a plan asset when it is received by an intermediary whose obligation is to transfer it directly to a participant.  As between the plan and the participant, it is the participant who has the superior claim to property in the cash after redemption.  And that is a good reason to reject a claim that the cash should be treated as a plan asset for the purpose of enforcing fiduciary responsibilities under ERISA.

It is not that we fail to recognize a distinction between the insurance cases and this one.  There, the insurer, acting as

both the investment vehicle and the distribution agent, paid the beneficiary without assistance from an intermediate fiduciary. Here, by contrast, the investment vehicle (the mutual fund) pays the participant through an intermediary selected by the plan to serve as the distribution agent (Fidelity). But because the path of the fund payouts does not include the plans, which apparently would be barred from holding the cash as they previously held the shares, plaintiffs have given no good reason why this distinction should make a difference to the plan-asset analysis of float for purposes of applying ERISA.[7]

In emphasizing the contours of our holding today, we should mention one other feature that we take to be common to this case and the insurance cases. When we turned away those earlier claims of fiduciary breach, we relied on the fact that the plan documents contemplated the RAA method of paying benefits. Vander Luitgaren, 765 F.3d at 64; Merrimon, 758 F.3d at 58. Here,

---

[7] We assume, because no one contends otherwise, that the retirement plan shoulders the ultimate responsibility for effecting a distribution, no matter the contours of a particular distribution scheme. Nothing in today's opinion should be read to bear on that assumption. Here we decide only the narrow question whether, given the distribution scheme under review, float is a plan asset for purposes of ERISA sections 404(a) and 406(b). Our negative answer to that question does not, for instance, alter the fact that a disbursement from Fidelity (as plan trustee) to a participant constitutes a "distribution . . . [from] a qualified trust" for purposes of the Tax Code. 26 U.S.C. § 402(c)(4).

plaintiffs do not contend that the plan documents failed to give

notice of the disbursement process under review.[8]

--------

   [8] In <u>Merrimon</u>, we distinguished a case on which plaintiffs
rely here:

> The decision in <u>Mogel</u> v. <u>Unum Life Insurance
> Co.</u>, 547 F.3d 23, 26 (1st Cir. 2008), is not
> at odds with the conclusion that the monies
> retained by the insurer are not plan assets.
> <u>Mogel</u> involved a plan that contained a
> specific directive to pay beneficiaries in a
> lump sum.  The insurer ignored this specific
> directive and sought instead to redeem claims
> through the establishment of RAAs.  As has
> been widely recognized, this particularized
> policy provision explains this court's holding
> that the insurer, which had not paid the
> policy proceeds in a manner permitted by the
> plan documents, had violated its fiduciary
> duties.  Thus, neither the holding in <u>Mogel</u>
> nor its broadly cast language is binding
> precedent for purposes of this materially
> different case.

758 F.3d at 56-57 (citations omitted).   In support of the
proposition that it "has been widely recognized" that <u>Mogel</u> should
be limited to its facts, we cited <u>Edmonson</u> v. <u>Lincoln National
Life Insurance Co.</u>, 725 F.3d 406, 428 (3d Cir. 2013) ("[W]e do not
read <u>Mogel</u> as holding the retained assets were plan assets."), and
<u>Faber</u> v. <u>Metropolitan Life Insurance Co.</u>, 648 F.3d 98, 106-07 (2d
Cir. 2011) ("<u>Mogel</u> is better understood as predicated on the fact,
not present here, that the insurer failed to abide by plan terms
requiring it to distribute benefits in lump sums.").  So limited,
<u>Mogel</u> does not aid plaintiffs, who, as noted, do not contend that
the plan documents called for a distribution method different from
the one implemented.  Indeed, the plan documents here do not appear
to contain express provisions specifying a distribution method.
<u>Contra</u> <u>Vander Luitgaren</u>, 765 F.3d at 64 ("The Plan at issue here
states:  'The Death Benefit may be payable by a method other than
a lump sum.  The available methods of payment will be based on the
benefit options offered by [the insurer] at the time of
election.'"); <u>Merrimon</u>, 758 F.3d at 59 ("In this instance, each of
the plans provides that the insurer will, upon proof of claim, pay

Plaintiffs' failure to advance such a claim not only invites the contrast with <u>Mogel</u> v. <u>UNUM Life Insurance Co. of America</u>, 547 F.3d 23 (1st Cir. 2008), <u>see</u> <u>supra</u> note 8, but complements the absence of any timely argument of the sort presented by the Secretary of Labor as amicus curiae supporting plaintiffs. The Secretary contends that Fidelity's use of float violated ERISA fiduciary duties, not because float is a plan asset, but because Fidelity failed to seek and obtain the plans' permission to use float as it did. The Secretary's position, however, would take us beyond this case, since the causes of action pleaded in plaintiffs' complaint necessarily depend on float being a plan asset. Plaintiffs did not press a failure-to-obtain-agreement claim in the district court or in their opening brief here, and their reply brief's unsuccessful attempt to cast the Secretary's position as their own is, in any event, too little too late. We therefore do not consider the Secretary's argument. <u>See</u> <u>United States</u> v. <u>Parigian</u>, ___ F.3d ___, No. 15-1994, 2016 WL 3027702, at *5 (1st Cir. May 26, 2016) ("On this record, [a particular] argument . . . is both forfeited for failure to raise it below and waived for failure to preserve it on appeal. We have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are

---

the death benefit owed by 'making available to the beneficiary a retained asset account.'" (alterations and emphasis omitted)).

deemed waived."    (citations and internal quotation marks omitted)); <u>Downing/Salt Pond Partners, L.P.</u> v. <u>R.I. & Providence Plantations</u>, 643 F.3d 16, 28 (1st Cir. 2011) ("We decline to address . . . issues raised for the first time by [an] amicus . . . . Amici may not make up for waiver by a party and may not introduce a new argument into a case."  (citations, alterations, and internal quotation marks omitted)).  In so saying, we will probably not surprise the Secretary, whose brief states, "If this [c]ourt determines that plaintiffs have waived any argument that Fidelity violated its duties even if . . . float itself is not a plan asset, the Secretary urges the [c]ourt to reserve the issue . . . whether Fidelity, in the absence of an express agreement about float, has engaged in prohibited transactions and acted disloyally . . . ." Brief for the Secretary of Labor as Amicus Curiae Supporting Plaintiffs-Appellants at 20 n.7.  We accede to the Secretary's request and reserve the issue for timely presentment in another case.[9]

---

[9] It is notable that the Secretary supports plaintiffs' ultimate position but declines to join in their insistence that float is a plan asset.  In arguing that float is a plan asset, plaintiffs cite several guidance documents from the Department of Labor.  These documents do not, facially, support plaintiffs' desired conclusion.  If something below the surface of the documents indicated that float is a plan asset, presumably the Secretary would have drawn it to our attention.  The Secretary's decision to make a wholly different argument thus supports our view that the Department of Labor's documents do not have a bearing on our resolution of the claim that plaintiffs chose to advance. <u>See</u> Brief for the Secretary of Labor as Amicus Curiae Supporting

A final point in support of today's decision: in Tussey v. ABB, Inc., 746 F.3d 327 (8th Cir. 2014), the Eighth Circuit reached the same conclusion on materially similar facts. Indeed, it is undisputed that plaintiffs' complaint here is modeled on the complaint in Tussey, which involved some of the same defendants and similar trust agreements. Tussey reached the Eighth Circuit after a trial, and the appeal garnered this summary:

> The participants . . . fail to establish the [p]lan had any rights in the redemption account balance, which . . . was registered for the benefit of the investment options. . . . The participants agree with Fidelity that the funder of the check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned on that float, but the participants contest the ownership of the funds at issue. The participants assert, [i]n this case, the owner is the [p]lan, making the float income a [p]lan asset. But the participants do not cite any record evidence establishing the [p]lan as the funder of the check or the owner of the funds in the redemption account. Absent proof of any ownership rights to the funds in the redemption account, the [p]lan had no right to float income from that account.

Id. at 340 (footnote, alterations, emphasis, and internal quotation marks omitted). Plaintiffs' allegations here are as lacking as the proffers in Tussey.

---

Plaintiffs-Appellants at 25 (explaining that "the [Department of Labor] guidance [documents] did not rely on or answer th[e] question" whether float is a plan asset).

**III**

The district court's judgment is AFFIRMED.