# United States Court of Appeals

## For the First Circuit

No. 20-1286

IN RE:  FIDELITY ERISA FEE LITIGATION

ANDRE W. WONG, on behalf of the T-Mobile USA, Inc. 401(k)
Retirement Savings Plan and Trust and on behalf of all other
similarly situated Employee Benefit Plans; JANICE ANDERSEN;
JASON BAILIS; NATALIE DONALDSON; CYNTHIA EDDY; MYRL JEFFCOAT;
THOMAS GOODRICH; KAYLA JONES; KAREN PETTUS; GINA SUMMERS;
HEATHER WOODHOUSE; REGINA CRYSTAL ROBINSON, on behalf of the
T-Mobile USA, Inc. 401(k) Retirement Savings Plan and Trust and
on behalf of all other similarly situated Employee Benefit
Plans; TYLER WAYNE SILLS, on behalf of the T-Mobile USA, Inc.
401(k) Retirement Savings Plan and Trust and on behalf of all
other similarly situated Employee Benefit Plans; CATEENIA D.
JOHNSON, on behalf of the T-Mobile USA, Inc. 401(k) Retirement
Savings Plan and Trust and on behalf of all other similarly
situated Employee Benefit Plans,

Plaintiffs, Appellants,

BOARD OF TRUSTEES OF UFCW LOCAL 23 & GIANT EAGLE PENSION FUND,

Plaintiff,

v.

FMR LLC; FIDELITY MANAGEMENT & RESEARCH COMPANY; FIDELITY
MANAGEMENT TRUST COMPANY; FIDELITY BROKERAGE SERVICES LLC;
NATIONAL FINANCIAL SERVICES LLC; FIDELITY INVESTMENTS
INSTITUTIONAL OPERATIONS COMPANY, INC.,

Defendants, Appellees,

JOHN AND JANE DOES 1-10,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta and Barron, Circuit Judges,
and Smith,* District Judge.

Alec J. Berin, with whom James E. Miller, Laurie Rubinow, Shepherd, Finkelman, Miller & Shah, LLP, David Pastor, and Pastor Law Office were on brief, for appellants.
Bradley N. Garcia, with whom Jonathan D. Hacker, Brian D. Boyle, and O'Melveny & Myers LLP were on brief, for appellees.

March 5, 2021

---

* Of the District of Rhode Island, sitting by designation.

**KAYATTA**, **Circuit Judge**. The plaintiffs in this putative class action are participants in 401(k) retirement plans sponsored by their respective employers. They train our attention on fees that the defendant, Fidelity,[1] charges some mutual funds for the privilege of being placed on the menu of investment options Fidelity makes available to 401(k) plans that contract with it to receive an array of services and investment opportunities. Seeking equitable and remedial relief on behalf of themselves and the retirement plans in which they participate, plaintiffs contend that Fidelity's exaction and retention of those fees violate fiduciary duties it owes to its customer plans and their participants under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. In granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the district court disagreed. For the following reasons, so do we.

## I.

We resolve first a procedural dispute concerning the scope of the record appropriate for our consideration in reviewing the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). When a complaint expressly cites and relies upon a written contract in support of a claim, the drafter of the

---

[1] Plaintiffs have sued FMR LLC and several related Fidelity entities and affiliates, known and unknown. For ease of reference, we refer to all of the defendants collectively as "Fidelity" or "defendant."

complaint cannot prevent the court from considering the written contract in ruling on a motion under Rule 12(b)(6).  See Beddall v. State St. Bank and Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."); see also Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229 n.1 (1st Cir. 2013) (declining to accept truth of factual allegation contradicted by rider to mortgage agreement).  Here, plaintiffs' Consolidated Amended Complaint ("the Complaint") devotes an entire section to "the Contracts," a set of "standard form agreements" between Fidelity and its customers.  The Complaint then describes the Contracts at some length, expressly labeling Fidelity's authority as "[p]ursuant to the Contracts."  So the Contracts are undoubtedly central to plaintiffs' Complaint.

Quite unremarkably, Fidelity therefore filed with its motion to dismiss a copy of relevant portions of its agreements with T-Mobile USA, Inc., the employer of four of the plaintiffs, as an example of the "standard form agreements" described in the

Complaint.[2] Fidelity also produced copies of the complete T-Mobile Contracts to plaintiffs' counsel, allowing them to bring any other sections to the court's attention. Plaintiffs then objected to the court's consideration of the T-Mobile Contracts on the basis of lack of authenticity. When the district court sought clarification about the authenticity objection, plaintiffs forthrightly conceded that they had no basis to say that the T-Mobile Contracts were not what they purported to be. Rather, they argued that they simply could not verify that for themselves without discovery.

We see no error in the district court's decision to consider the T-Mobile Contracts. Fidelity filed a declaration under penalty of perjury signed by its Vice President of Contracts authenticating the excerpts and the complete, current set of agreements from which they were drawn. Were the declaration false, it would be easily seen as such by the thousands of employers and plan officials who have entered into these "standard form agreements" with Fidelity, including the officials at T-Mobile who administer the plan in which four of the named plaintiffs participate. We see no good faith basis for disputing the T-Mobile Contracts' authenticity.

---

[2] The excerpts were drawn from the Service Agreement and Basic Plan Document for the T-Mobile USA, Inc., 401(k) Plan. We refer to these excerpts collectively as "the T-Mobile Contracts."

So we turn now to the factual allegations of the Complaint as supplemented by the T-Mobile Contracts. We describe here the basic outline of the dealings at issue, adding further detail later in this opinion where most relevant to our consideration of plaintiffs' various claims.

Since 1989, Fidelity has maintained what it calls a "supermarket" named the FundsNetwork. Rather than offering groceries, the FundsNetwork stocks thousands of opportunities to invest in mutual funds established by third parties other than Fidelity.

Fidelity's customers include approximately 24,000 employer-established retirement plans. For each plan, Fidelity performs recordkeeping, takes possession of plan assets, and invests those assets at the direction of the plan or a plan participant. Each plan selects from the FundsNetwork's offerings the particular mutual funds in which each particular plan's participants may invest. The plans pay Fidelity an agreed-upon fee for its services.

Fidelity also charges some of the mutual fund managers a so-called "infrastructure fee" for the privilege of being listed as an investment opportunity in the FundsNetwork. In online notices to which the Complaint directs us, Fidelity describes these fees to its plan customers and their participants as "supermarket

fees (paid by the fund company to Fidelity)," Understanding Fidelity's FundsNetwork® Fees, Fidelity, http://www.fidelity.com/mutual-funds/all-mutual-funds/fees (last visited Mar. 4, 2021), or, more specifically, as "a fee from unaffiliated product providers to compensate Fidelity for maintaining the infrastructure to accommodate unaffiliated products," Brokerage Commission and Fee Schedule, Fidelity, http://www.fidelity.com/bin-public/060_www_fidelity_com/documents/brokerage_commissions_fee_schedule.pdf (last visited Mar. 4, 2021).

The pivotal question here is whether the Complaint's allegations regarding this arrangement plausibly paint Fidelity as a fiduciary for the plans (or their participants) with respect to the collection of infrastructure fees from some of the fund managers whose funds appear in Fidelity's FundsNetwork. We review de novo the district court's negative answer to that question in dismissing the complaint for failure to state a claim. See In re Fid. ERISA Float Litig., 829 F.3d 55, 59 (1st Cir. 2016).

## III.

The parties agree that under ERISA, a person may be a fiduciary because he is so identified in a plan instrument or pursuant to a procedure specified in that instrument. 29 U.S.C. § 1102(a). A person not named as a plan fiduciary may nevertheless

- 7 -

become a "functional fiduciary" depending on his relationship with the plan. Specifically, a person is a functional fiduciary

> with respect to a plan <u>to the extent</u>

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).

This qualified language makes clear that functional fiduciary status is not an all-or-nothing designation. <u>See</u> <u>Beddall</u>, 137 F.3d at 18. A person or entity can be a fiduciary of a plan for some purposes and not for others. <u>See</u> <u>Pegram</u> v. <u>Herdrich</u>, 530 U.S. 211, 225 (2000). So "[i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." <u>Id.</u> at 226.

Plaintiffs advance three arguments for treating Fidelity as a functional fiduciary. We consider each in turn.

- 8 -

Plaintiffs argue first that Fidelity acted as a fiduciary by exercising control over the factors affecting the compensation it receives from the plans. Plaintiffs advance two theories in support of this argument.

**1.**

Plaintiffs' first theory does not rely on the infrastructure fees. Rather, plaintiffs assert that under the T-Mobile Contracts (and other standard form agreements like them) Fidelity retains discretion over the payments by the plans because Fidelity may "unilaterally change its investment management and administrative charges assessed under the Contracts." See, e.g., Golden Star, Inc. v. Mass. Mut. Life Ins. Co., 22 F. Supp. 3d 72, 81 (D. Mass. 2014) (finding that service provider was a fiduciary where it "had the discretion to unilaterally set fees up to a maximum and exercised that discretion"). But the T-Mobile Contracts say no such thing. Rather, Fidelity sets the fees by agreement. See T-Mobile Service Agreement, art. II, § 11. Undeterred, plaintiffs reason that another clause allows Fidelity to amend the T-Mobile Contracts "unilaterally." T-Mobile Service Agreement, art. II, § 12. But that power is contingent on there being "no impact on the fees set forth in this Agreement." T-Mobile Service Agreement, art. II, § 12 (amended Apr. 1, 2016). So plaintiffs retreat to their contention that we must turn a blind

eye to what the T-Mobile Contracts actually say because they are not attached to the Complaint. And that is a contention we have already rejected.

## 2.

Plaintiffs' second theory in support of their argument that Fidelity exercises discretionary control over its compensation posits that in charging infrastructure fees to mutual funds, Fidelity effectively increased the amount of compensation it received from the plans, and thereby should be deemed to be a fiduciary with respect to the collection of such fees. Of course, the fees in question are paid by the mutual funds, not the plans. But plaintiffs reason that the burden of any fee paid by a mutual fund to Fidelity is passed through to the plan participants in the form of increased fees charged by the mutual funds to participants who chose those funds. Plaintiffs offer no example of any such pass-through by any mutual fund. Rather, they contend it is probable as a matter of "simple economics." We doubt that is so, at least absent a basis to conclude that Fidelity charges fees in a manner that affects a fund's expense ratio for every investor or that both the law and the lack of market competition allow the funds in question to charge different investors undisclosed different amounts. But for Rule 12(b)(6) purposes we will assume it is true.

- 10 -

This theory for labeling the infrastructure fee a payment by the plans stumbles initially because Fidelity provides consideration in return for the payment of the fee by the funds -- access to the FundsNetwork. In this respect, Fidelity is like a supermarket that charges a vendor a fee in return for favorable shelf space. No one would deem that fee to be compensation from the supermarket's customers.

Plaintiffs' theory also overlooks the numerous intervening and independent decisions inherent in the so-called pass-through to which they point. This series of independent decisions precludes us from agreeing with plaintiffs that the infrastructure fees are compensation paid to Fidelity by the plans. Fidelity must negotiate the fee with the fund manager, who remains free to agree or not. The fund manager -- not Fidelity -- then decides whether or not to try to increase its fees charged to investors -- and such fees must be disclosed. See Form N-1A Registration Form for Open-End Management Investment Companies (2021), General Instructions to Item 3, http://www.sec.gov/files/formn-1a.pdf (requiring mutual funds to disclose expense ratios in registration statements); 17 C.F.R. § 230.485 (requiring advance notice for post-effective date

amendments to fund registration statements).[3] Even then, the fund would only be listed by Fidelity as an available option on the FundsNetwork. It would remain for the plan's fiduciary investment advisors to decide whether to make the fund available to that plan's participants. In other words, even if Fidelity puts the fund on FundsNetwork (sometimes called its "Big Menu"), a plan must select that fund for its "Small Menu" before it becomes a permissible investment option for the plan's participants. And it would ultimately be up to the participants to decide whether to invest in the fund. Only then would the theoretical pass-through of infrastructure fees posited by the plaintiffs occur.

This theoretical pass-through is no less the product of independent decisions if Fidelity negotiates infrastructure fees with the mutual funds after a plan has already retained Fidelity as a service provider and selected the fund for its Small Menu. Fidelity and the fund would still have to agree on the fee, the fund would still have to decide to raise its investment fees, and

---

[3] At oral argument, plaintiffs' counsel acknowledged that mutual funds must disclose their expense ratios up front but suggested that funds may still pass through infrastructure fees by charging transaction fees deducted from the fund's return. Plaintiffs argue that this method of fee assessment obscures an infrastructure fee's negative effect on the fund's performance and, by extension, the participants. This argument does not alter our conclusion. Rather, it underscores that funds -- not Fidelity -- decide whether and how to charge fees to investors.

- 12 -

the plan would still have to decide to continue offering the fund on its Small Menu.

Plaintiffs point to no case treating such a series of independent decisions as the equivalent of Fidelity controlling its compensation from plans. One could just as easily say that by charging infrastructure fees to funds, Fidelity lowers the costs it incurs as a service provider, and thus can agree to charge plans less; indeed, it likely would charge less unless it has market power. Plaintiffs also overlook the significance of having other fiduciaries in this chain of independent decision-making. It is difficult to see what would be gained in the end for plan participants by trying to deem Fidelity's attempt to sell shelf space to fund managers to be a fiduciary function on behalf of Fidelity's plan customers.

All in all, we see nothing here that calls for treating Fidelity's charging of fees to some funds as an exercise of authority or control over any plan assets, management, or administration.

**B.**

Plaintiffs next argue that Fidelity acts as a fiduciary in determining which mutual funds it includes or removes from its FundsNetwork. Two circuits have rejected this argument as applied to comparable "product design" decisions. <u>See</u> <u>Santomenno</u> v. <u>John Hancock Life Ins. Co. (USA)</u>, 768 F.3d 284, 295 (3d Cir. 2014);

- 13 -

Leimkuehler v. Am. United Life Ins. Co., 713 F.3d 905, 911 (7th Cir. 2013). Indeed, those courts have rejected this argument as applied to Fidelity's actions as a service provider. See Renfro v. Unisys Corp., 671 F.3d 314, 323 (3d Cir. 2011); Hecker v. Deere & Co., 556 F.3d 575, 583 (7th Cir. 2009). So, too, have two district courts in this circuit concluded that where the plan, not Fidelity, made the final decision about which investment options to offer participants, Fidelity was not a fiduciary with respect to its receipt of revenue-sharing payments. See Fleming v. Fid. Mgmt. Tr. Co., No. 16-cv-10918-ADB, 2017 WL 4225624, at *5 (D. Mass. Sept. 22, 2017) (unpublished); Columbia Air Servs. Inc. v. Fid. Mgmt. Tr. Co., No. 07-cv-11344-GAO, 2008 WL 4457861, at *4 (D. Mass. Sept. 30, 2008) (unpublished).

Plaintiffs' advocacy to the contrary ignores the nature of the relative roles played in these transactions. The plans and their investment advisors decide which investment opportunities are made available to their participants. In making these decisions, they have a variety of vendors from whom they might obtain access to investment opportunities, either directly or indirectly. Fidelity is just one of those options. Should a plan choose Fidelity, it then chooses which funds to select from Fidelity's Big Menu of offerings, which include Fidelity and non-Fidelity funds. With knowledge of their participants' investment

goals, the plan and its investment advisors assemble the Small Menu from which the participants pick.

Nothing in this arrangement suggests that Fidelity must automatically be treated as if it were also a fiduciary advising which options to select. See 29 U.S.C. § 1002(21)(A) (designating as a fiduciary a person who "renders investment advice for a fee or other compensation"). ERISA does not treat as a fiduciary one who offers without advice numerous investment options from which an investment advisor might select investments. To rule otherwise would be to deprive plan fiduciaries of the benefit of having vendors who need not themselves bear the expense of duplicating the investment advisor's fiduciary role.

As we have noted, case law almost directly on point flatly rejects plaintiffs' notion that Fidelity acts as a fiduciary in selecting funds for its FundsNetwork. In an effort to transform their claim into a version less vulnerable to this accumulating authority, plaintiffs in their brief argue that Fidelity also controls which funds are actually offered to plan participants on each plan's Small Menu. This argument, though, finds no footing in the Complaint. While the Complaint alleges repeatedly that Fidelity controls which funds are made "available to the Plans," there is no claim that Fidelity has control over which funds a plan selects for the menu available to the plan's participants. Moreover, the T-Mobile Contracts belie the assertion raised in

- 15 -

plaintiffs' briefs. The T-Mobile Contracts make clear that "Fidelity shall have no responsibility for the selection of Permissible Investments for the Plan" and that "[a]ll Plan assets must be invested in the Permissible Investments selected by the Employer . . . ." T-Mobile Service Agreement, art. II, § 5; see also T-Mobile Basic Plan Document, § 8.01 ("The Accounts of Participants shall be invested and reinvested only in Permissible Investments designated in the Service Agreement. The Trustee shall have no responsibility for the selection of Permissible Investments . . . ."). As Fidelity persuasively argues, these provisions show that Fidelity cannot take actions that affect a participant's existing investment in an option on a plan's Small Menu.

What plaintiffs may mean to say is that the very decision to list or delist a fund on the FundsNetwork itself indirectly controls whether it can be chosen when a plan designs its Small Menu. In an advisory opinion, the Department of Labor has opined that a service provider does not become a fiduciary "solely as a result of deleting or substituting a fund from a program of investment options and services offered to plans, provided that the appropriate plan fiduciary in fact makes the decision to accept or reject the change" after being given "advance notice of the change" and "a reasonable period of time within which to decide whether to accept or reject the change and, in the event of a

- 16 -

rejection, secure a new service provider." Dep't of Labor Pension & Welfare Benefit Programs, Op. 97-16A, 1997 WL 277979, at *5 (May 22, 1997). One district court in this circuit has concluded that the prerequisites identified in the DOL's guidance are necessary to ensure "that the Plan has the final authority on which investment options are available." Golden Star, Inc., 22 F. Supp. 3d at 82. Plaintiffs claim that Fidelity makes changes to its fund offerings without such notice or opportunity for rejection.

We need not decide whether the ability to change unilaterally the Small Menu offerings by changing the Big Menu's offerings per se turns the service provider into a fiduciary absent the notice and rejection opportunities noted in the DOL opinion. Here, the Complaint contains no allegation that Fidelity's decision to stop offering a fund in its FundsNetwork removes that fund from those already selected by a plan for its Small Menu. The absence of such an allegation from the Complaint is unsurprising because, as noted already, the T-Mobile Contracts preclude Fidelity from having any "responsibility for the selection of Permissible Investments for the Plan." And, adding belt to suspenders, if a plan or its investment advisors become

dissatisfied with Fidelity's Big Menu offerings, they could opt to shop elsewhere.[4]

## C.

Plaintiffs' final fiduciary status argument trains on the fact that Fidelity can successfully impose infrastructure fees only because it has in its hands lots of plan assets to be invested. As directed trustee for the plans, Fidelity is obligated to safeguard and allocate assets in accordance with participants' investment directions. See T-Mobile Basic Plan Document, § 20.04 ("The Trustee shall have no discretion or authority with respect to the investment of the Trust Fund but shall act solely as a directed trustee of the funds contributed to it."); 29 U.S.C. § 1103(a)(1) (permitting plan assets to be managed and controlled by a trustee "subject to proper directions" of a named fiduciary). According to the Complaint, Fidelity performs its directed trustee duties by pooling participants' investments in a particular fund into an "Omnibus Account." Plaintiffs argue that Fidelity's acts

---

[4] Plaintiffs suggest that their ability to take their business elsewhere could be restricted by an inappropriate termination fee. See Rozo v. Principal Life Ins. Co., 949 F.3d 1071, 1074-75 (8th Cir. 2020) (holding that fee for leaving the plan and year-long delay in fund withdrawal were impediments to exit that made service provider a fiduciary). But plaintiffs acknowledge that the motion to dismiss record is "devoid of any evidence either way" about whether Fidelity charges plans a termination fee. This gap in the record is plaintiffs' problem, as they bear the burden of setting forth allegations that state a plausible claim for relief.

- 18 -

as a directed trustee relate to its collection of infrastructure fees because funds pay those fees to gain access to the Omnibus Account assets. But Fidelity is able to charge funds a fee because it has lots of customers, not because it controls those customers or their assets in any meaningful manner. The fund simply gets on the store's shelves, and the participant has the final say on whether the fund also gets in the grocery cart.

None of this is to ignore the fact that Fidelity does have some fiduciary duties vis-à-vis the plans and their participants. Rather, the point is that Fidelity's actions in a fiduciary capacity are not the subject of plaintiffs' complaint. See Pegram, 530 U.S. at 226; see also Leimkuehler, 713 F.3d at 912-14 (explaining that service provider's management of assets in accordance with participant instructions did not make the service provider a fiduciary with respect to challenged action); Renfro, 671 F.3d at 323 ("Fidelity's limited role as a directed trustee . . . does not encompass the activities alleged as a breach of fiduciary duty."). Fidelity's fiduciary responsibilities as a directed trustee are distinct from and do not extend to Fidelity's charging of an infrastructure fee.

**D.**

Plaintiffs also argue that the district court improperly dismissed the Complaint as to several unnamed defendants when it invoked Federal Rule of Civil Procedure 4(m). We may affirm the

dismissal of a complaint "on any basis available in the record." Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 30 (1st Cir. 2020) (quoting Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013)).  Plaintiffs offer no theory of liability applicable to the unnamed defendants that we have not already rejected above. We therefore dismiss the Complaint as to all of the defendants, named and unnamed.  Cf. Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 57-58 (1st Cir. 2013) (affirming dismissal of claims against unnamed defendants where plaintiffs did not develop argument as to sufficiency of claims against those defendants).

## IV.

For the foregoing reasons, we affirm the dismissal of plaintiffs' Consolidated Amended Complaint.