[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-12366

————————————————

ERIC ROMANO,
TODD ROMANO,

Plaintiffs-Appellants
Cross Appellee,

*versus*

JOHN HANCOCK LIFE INSURANCE COMPANY (USA),

Defendant-Appellee
Cross Appellant.

————————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21147-JG

————————————————

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

JORDAN, Circuit Judge:

"The aim of ERISA is 'to make the plaintiffs whole, but not to give them a windfall.'" *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.) (quoting *Jones v. Unum Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000)). The question in this case is whether, under the fiduciary duty provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109(a), the value of certain foreign tax credits received by John Hancock should have been passed through to a class of defined-contribution plans. Eric and Todd Romano, as class representatives and the trustees of the Romano Law, PL 401(k) Plan, contend that they should have been, and because they were not, John Hancock breached its fiduciary duties under ERISA.

Following a review of the record and with the benefit of oral argument, we affirm the district court's order granting summary judgment in favor of John Hancock. As we explain, John Hancock was not an ERISA fiduciary with regard to the matter at issue and the Romanos (and the other plans) are therefore not entitled to the value of the foreign tax credits. To rule otherwise would provide them a windfall.

## I

We take the following facts in the light most favorable to the Romanos and draw reasonable inferences in their favor. *See Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022).

### A

John Hancock is an insurance company. Among other things, it provides investment and recordkeeping services to 401(k) retirement plans. One such retirement plan is the Romano Law, PL 401(k) Plan (the "Romano Law Plan"), for which Eric and Todd Romano act as trustees. The Romanos established the Romano Law Plan for themselves and the employees of their jointly-owned law firm, Romano Law, PL. To do so, they engaged a financial advisor, Christian Searcy, Jr., to recommend service providers and investments. On the advice of Mr. Searcy, Jr., the Romanos contracted with John Hancock and entered into a "Signature" platform group variable annuity contract, which made a menu of investment options available for the Romano Law Plan and its participants. The Romanos also executed a recordkeeping agreement, under which John Hancock agreed to provide administrative and recordkeeping services.

The Signature platform is at issue here. As it did with the Romano Law Plan, John Hancock enters into two standardized form contracts—a group annuity contract and a recordkeeping agreement—with each retirement plan that signs up for the Signature platform. The investment options made available under the Signature platform include certain mutual funds. John Hancock first selects a group of mutual funds for the platform and then each retirement plan chooses a subset of those funds for investment by the plan and its participants. From that subset of mutual funds

chosen by a plan, the individual participants are then able to determine which specific funds they wish to invest in.

Neither the Romano Law Plan nor its participants, however, invested directly in the mutual funds. Rather, the group annuity contract allowed the Romano Law Plan to make contributions into John Hancock "separate accounts," which are accounts "segregated from the general funds of [John Hancock]." This meant that "[a]ny income, gains, or losses . . . from assets in a Separate Account w[ould] be credited or charged against said account with regard to the other income, gains, or losses of [John Hancock]." The separate accounts were divided into sub-accounts that corresponded to the mutual funds and other investment options available under the contracts that John Hancock maintained with the respective retirement plans.

The Romano Law Plan's assets were allocated among those sub-accounts, which were established, administered, owned, and managed by John Hancock. John Hancock was also the legal and taxable owner of the assets in the separate accounts. But the separate accounts were not chargeable with any of John Hancock's liabilities outside of the group annuity contracts and the recordkeeping agreements (hence the "separate" label).

Because the sub-account transactions were processed only at the direction of the Romano Law Plan and its participants, the group annuity contract explained that, by availing the Plan and its participants of its platform of investments and by providing record-keeping services, John Hancock did "not assume any fiduciary

responsibility of the Contractholder, Plan Administrator, Plan Sponsor or any other Fiduciary of the Plan." Group Annuity Contract, D.E. 1-1 at 13–14. The recordkeeping agreement similarly explained that John Hancock would not have any discretionary authority or responsibility for the management or control of the separate accounts' assets; instead, its authority was limited to holding the assets in the separate accounts and allocating them as instructed by the Romanos and their participants. *See* D.E. 110-11.

John Hancock's fees for administrative and recordkeeping services included an "Annual Maintenance Charge" of 0.60% of the assets in each sub-account. The group annuity contract at issue here contained the following provision concerning John Hancock's use of credits, fees, or revenue sharing to reduce the Annual Maintenance Charge for its services:

> The revenue sharing as well as the credits that the Company receives in respect of an underlying investment vehicle affiliated with the Company are sometimes generically referred to as "revenue from underlying fund." The amount of revenue received by the Company from the underlying vehicle varies from Fund to Fund. The Company uses all revenue received from the underlying fund, trust or portfolio to reduce the [Annual Maintenance Charge] for the [s]ub-account such that the sum of such revenue from the underlying mutual fund, trust or portfolio and the [Annual Maintenance Charge] is equal to 0.60% of your Contract assets invested in each [s]ub-account.

Group Annuity Contract, D.E. 1-1 at 19. In short, John Hancock agreed to use those revenue-sharing fees and credits as an offset to "reduce the [Annual Maintenance Charge]" charged to the plans. *Id.*

The Romanos received a "Supplemental Information Guide" and a recordkeeping agreement, both of which disclosed the total cost of investing in each sub-account after any reductions were applied. They also received a "Fund Information Guide," which contained additional information about the sub-accounts and their investments and fees. The Guide also explained that additional information about each fund was "available upon request," including "complete details on investment objectives, risks, fees, charges and expenses as well as other information about the underlying investment vehicle, which should be carefully considered."

None of these documents disclosed that John Hancock received and retained foreign tax credits from the mutual fund shares owned in the separate accounts. These foreign tax credits—and John Hancock's undisclosed retention of them—constitute the crux of this litigation. We therefore explain them in detail.

**B**

As discussed, the Romano Law Plan was presented with a group of mutual funds by John Hancock pursuant to its group annuity contract. On the advice of Mr. Searcy, Jr., the Romanos, as trustees, chose options for the Romano Law Plan from over 200 sub-accounts. Some of the chosen sub-accounts owned shares in

mutual funds that invested in foreign securities and were therefore subject to foreign taxes.

These foreign taxes had U.S.-based tax implications. The Internal Revenue Code taxes all income of U.S. taxpayers earned worldwide. *See* 26 U.S.C. § 61(a). To avoid double taxation of income earned abroad—by both the United States and the country in which the income was earned—Congress established the foreign tax credit regime under the Code. When a U.S. taxpayer pays income tax to another country due to its business activities in that country, the taxpayer can claim a dollar-for-dollar credit against its tax liability in the United States for the foreign taxes already paid. *See* 26 U.S.C. §§ 853(b)(2)(A), 901–909. *See also* Paul R. McDaniel et al., Introduction to United States International Taxation ¶¶ 6.1–6.2 (6th ed. 2014) ("Generally speaking, it is to the taxpayer's advantage to elect the foreign tax credit rather than the deduction. The credit produces a dollar-for-dollar offset against US tax liability; the benefit of a deduction is limited to the amount of the foreign income taxes multiplied by the taxpayer's marginal US tax bracket (i.e., generally a maximum reduction for a corporation of 35 cents in US tax for each dollar of foreign tax paid.")); Robert J. Misey, Jr. & Michael S. Schadewald, Practical Guide to U.S. Taxation of International Transactions ¶¶ 4.01–4.03 (6th ed. 2007) (providing an overview of foreign tax credit regime and noting that "[t]axpayers have the option of deducting foreign income taxes in lieu of taking a credit"). This credit offsets the taxpayer's United States tax liability and reduces its overall tax bill. *See* McDaniel et al., International Taxation at ¶ 6.2.

The Code permits certain regulated investment companies, such as mutual funds, to pass through tax credits to their shareholders. *See* 26 U.S.C. § 853. A number of mutual funds available on John Hancock's Signature platform elect to operate under this provision of the Code and do just that. Because John Hancock is the legal and taxable owner of the shares of the mutual funds, it receives the passed-through foreign tax credits from such mutual funds.

Recall, however, that the shares of the mutual funds are purchased with assets from the pooled 401(k) retirement plans, including the Romano Law Plan. According to the Romanos and the class of similarly situated plans, John Hancock should therefore be required to pass through the benefits of the foreign tax credits to the plans, whose assets are reduced by the amount of the foreign taxes paid with the assets of the sub-accounts. In their view, the group annuity contract also requires that John Hancock offset the cost of its recordkeeping services—the Annual Maintenance Charge—by the value it receives from the foreign tax credits.

As John Hancock sees things, under the Code a mutual fund paying foreign taxes may make an election requiring shareholders that are U.S. taxpayers to include the amount paid in foreign taxes as income on their federal income tax returns—known as a foreign tax "gross up." *See* 26 U.S.C. § 853(b)(2)(A). When that occurs, the shareholders may also qualify for a choice between a corresponding foreign tax credit or a deduction. *See id.* Here, because John Hancock is the taxable owner of the mutual fund shares held in the

separate accounts, it—and only it—is required to gross-up its taxable income to include the foreign taxes paid by a mutual fund that makes this election.  Thus, these tax obligations apply only to John Hancock, and not to its ERISA-governed plan customers such as the Romano Law Plan.[1]

From 2013 through 2019, John Hancock received more than $130 million in foreign tax credits from the various plans' investments.  John Hancock used these credits to reduce its overall U.S. tax liability by tens of millions of dollars.  The Romanos' expert calculated that the monetary value of the foreign tax credits to John Hancock from 2013 through 2019 exceeded $90 million.

## C

The Romanos, as the trustees of the Romano Law Plan, filed a class action against John Hancock, asserting two claims.  The first was that John Hancock breached its fiduciary duties under ERISA. The second was that John Hancock, as a fiduciary, violated ERISA's prohibited-transaction provisions.  The district court certified a nationwide class of trustees of defined-contribution plans that entered into group annuity contracts and recordkeeping agreements with John Hancock, and that selected mutual funds which paid foreign taxes.

---

[1] John Hancock also submits that even if the Romano Law Plan were the owner of the mutual fund shares, it does not pay federal income taxes because of its tax-exempt status. The Romano Law Plan therefore would still not be eligible for a corresponding foreign tax credit or deduction and could not offset the foreign tax payments made.

Two orders are at issue in this appeal.  The Romanos appeal the district court's order granting summary judgment in favor of John Hancock on their ERISA claims.  John Hancock cross-appeals the district court's order denying its motion to strike the Romanos' jury demand on behalf of the class.  Because we affirm the summary judgment order, we do not reach John Hancock's cross-appeal.

## II

The district court's order granting summary judgment is subject to plenary review.  *See Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324, 1328 (11th Cir. 2023).  The same standard applies to the district court's Article III standing determination.  *See Wilding v. DNC Servs., Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019).

In its summary judgment order, the district court concluded that John Hancock was not an ERISA fiduciary for the conduct underlying the Romanos' claims, did not breach any ERISA fiduciary duties, or engage in ERISA prohibited transactions.  The district court also ruled that the Romanos and the class failed to establish loss causation and therefore lacked Article III standing.  We disagree with the district court on standing, but affirm its summary judgment order on the merits.

## III

Article III standing is a threshold jurisdictional matter, so we begin there.  *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024).

The Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (internal quotation marks omitted). To establish this "personal stake," a plaintiff must show (i) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury could likely be redressed by judicial relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

"[C]ertain harms readily qualify as concrete injuries under Article III." *TransUnion*, 594 U.S. at 425. Traditional tangible harms, such as physical and monetary harms, are among "[t]he most obvious." *Id.* "Various intangible harms can also be concrete," including "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* But a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

A plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561, but the Supreme Court has cautioned that federal courts "must not 'confuse weakness on the merits with absence of Article III standing.'" *Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quoting *Davis v. United*

*States*, 564 U.S. 229, 249 n.10 (2011)).  Indeed, in assessing standing, "the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."  *Culver-house v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016) (citation and internal quotation marks omitted).  *See also Moody v. Holman*, 887 F.3d 1281, 1285–86 (11th Cir. 2018) (explaining that standing and the lack of a cause of action are not interchangeable concepts).

Here, the district court ruled—after a full decision on the merits of the claims—that the Romanos (and therefore the class) had not shown an injury attributable to John Hancock's use of the foreign tax credits.  This was because the Romano Law Plan could not use the foreign tax credits (as a tax-exempt plan) and because the Plan's "contractual entitlement was to assets valued using a mutual fund's [net asset value]," which was determined net of any foreign taxes.  *See* D.E. 339 at 81.  Accordingly, the district court ruled that the Romanos and the class "have no standing to seek any monetary relief because they have not incurred a redressable injury."  *Id.*

The Romanos satisfied the injury-in-fact, causation, and redressability requirements of standing at the summary judgment phase.  They asserted (and provided some evidence to support their theory) that both under ERISA and the respective plans' contractual agreements with John Hancock—namely, the group annuity contracts and recordkeeping agreements—they and the class

members were entitled to the monetary value of the foreign tax credits retained by John Hancock. And they asserted entitlement to monetary damages under ERISA because John Hancock kept the foreign tax credits—valued at over $90 million—for which the Romanos, the class members, and their respective plans paid the underlying foreign taxes. In other words, the Romanos and the class paid for the benefit that was ultimately retained by John Hancock in purported breach of its ERISA fiduciary duties. Furthermore, pursuant to the group annuity contract, John Hancock agreed to use certain revenue-sharing fees and credits as an offset to reduce the Annual Maintenance Charge charged to the plans. *See* Group Annuity Contract, D.E. 1-1 at 19. The Romanos and the class asserted that John Hancock was required to apply the foreign tax credits to reduce the Annual Maintenance Charges to the respective plans and that the failure to do so should result in compensatory damages (for fees paid) or injunctive disgorgement (for an unjust benefit retained).

Whether these theories are legally sound or sufficient is another matter. But we must assume, for purposes of our standing analysis, that these theories are valid and will succeed. *See Culverhouse*, 813 F.3d at 994.

Both in its sequence of analysis and ultimate reasoning, the district court conflated the merits of the ERISA claims and the standing of the Romanos and the class to bring those claims. *See, e.g., Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) (explaining that Article III standing "must be addressed prior to *and*

*independent of* the merits of a party's claims") (emphasis added). *Cf. Warth v. Seldin*, 422 U.S. 490, 498 (1975) (noting that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues"). The district court's decision—and John Hancock's argument—would mean that "a plaintiff who ultimately loses on the merits (and by definition did not have a substantive right to relief) would never have had standing to pursue his or her claims in the first place. The law does not countenance, much less demand, such a result." *Moody*, 887 F.3d at 1287.

The Romanos and the class were not required to succeed on their ERISA claims in order to have Article III standing. To rule otherwise would allow a merits decision to swallow the antecedent matter of standing.

## IV

Having concluded that the Romanos and the class have Article III standing, we turn to the merits of the ERISA claims.[2]

ERISA sets minimum standards for employee benefit plans, such as the 401(k) contribution plans here. *See generally* 29 U.S.C. §§ 1001, 1002. It also creates federal causes of action for recovery of benefits under such plans. *See* 29 U.S.C. § 1132(a)(1)(B). For

---

[2] When a district court rules alternatively that it lacks subject-matter jurisdiction and that the plaintiffs' claims fail on the merits, we may affirm on the merits if we conclude that there was jurisdiction. *See, e.g., M.H.D. v. Westminster Schools*, 172 F.3d 797, 802 n.12 (11th Cir. 1999); *Rutherford v. McDonough*, 466 F.3d 970, 976 (11th Cir. 2006).

example, it permits plan participants to bring actions against plan fiduciaries for breach of their fiduciary duties and requires plan administrators, upon request, to provide plan information to participants at the risk of statutory penalties for failure to do so. *See 29 U.S.C.* §§ 1104, 1109(a), 1132(c)(1).

ERISA specifically provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). "The responsibility attaching to fiduciary status has been described as 'the highest known to law.'" *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (quoting *Herman v. Nationsbank Tr. Co. (Ga.)*, 126 F.3d 1354, 1361 (11th Cir. 1997)).

The Romanos assert two fiduciary duty claims against John Hancock under the civil remedy provision of ERISA, 29 U.S.C. § 1132. Both claims present issues of first impression. As far as we can tell, no courts have analyzed similar claims involving the retention of foreign tax credits.

First, the Romanos claim that John Hancock breached its duties under 29 U.S.C. § 1104(a)(1)(A), which requires a fiduciary to discharge its "duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) deferring reasonable expenses of administering the plan." Specifically, they assert that because John Hancock profited from the foreign tax credits without passing through a commensurate benefit to the underlying plans, it failed to act solely in the best interest of the plans and failed to defray the reasonable expenses of administering those plans.

Second, the Romanos claim that John Hancock engaged in prohibited transactions under 29 U.S.C. § 1106(b)(1), which forbids a fiduciary from "deal[ing] with assets of the plan in his own interest or his own account." By retaining the full benefit of the foreign tax credits generated by the plans' investments, the Romanos claim that John Hancock dealt with the assets of the plans for its own interest or account.

## A

In order to determine whether John Hancock is subject to ERISA's strict fiduciary obligations, *see, e.g.,* 29 U.S.C. § 1104(a)(1)(A), we must first ask whether the company is an ERISA fiduciary with respect to the Romano Law Plan and/or the foreign tax credits. Under ERISA, a person or entity is deemed a fiduciary either by being named as such in the plan document, or by performing or possessing the authority to perform certain functions.

*See* 29 U.S.C. §§ 1102(a), 1002(21)(A).  The latter—called a "functional fiduciary"—applies "to the extent (i) [the entity] exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets, (ii) [the entity] renders investment advice for a fee or other compensation . . . or (iii) [the entity] has any discretionary authority or discretionary responsibility in the administration of [the] plan."  § 1002(21)(A).  In other words, "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).  *See also Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 915 (11th Cir. 2022) ("Proof of fiduciary status may come from . . . the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document.") (internal quotation and citation omitted).  But "fiduciary status under ERISA is not an 'all-or-nothing concept,'" so "court[s] must ask whether a person is a fiduciary with respect to the particular activity at issue."  *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) (quoting *Coleman v. Nationwide Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992)).

The Romanos maintain that John Hancock was a functional fiduciary of the Romano Law Plan because it exercised authority or control respecting the management or disposition of the foreign tax credits, which they assert are plan assets, and because John Hancock exercised discretionary authority or responsibility in the administration and management of the separate accounts containing

the various mutual funds and investment vehicles.  We address each contention in turn.

**1**

"[D]ecisions about the content of a plan are not themselves fiduciary acts."  *Pegram v. Herdich*, 530 U.S. 211, 226 (2000).  Generally speaking, an entity's own day-to-day corporate functions, such as filing taxes, do not trigger fiduciary status.  *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1284 (11th Cir. 2012) ("When the defendants in this case filed the form S-8s and created and distributed the stock prospectuses, they were acting in their corporate capacity and not in their capacity as ERISA fiduciaries[;] they were conducting business that was regulated by securities law and not by ERISA[.]").

Apparently understanding this reality, the Romanos focus on the characterization of the foreign tax credits.  There is no dispute that John Hancock exercised discretionary authority over the foreign tax credits.  If those constituted plan assets under ERISA, then John Hancock may be an ERISA fiduciary.  We conclude, however, that the credits were not plan assets.

ERISA "contains no comprehensive definition of plan assets."  *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 89 (1993) (internal quotation marks omitted).  Some plan assets are defined by the regulations prescribed by the Secretary of the Department of Labor.  *See* 29 U.S.C. § 1002(42) ("[T]he term 'plan assets' means plan assets as defined by such regulations as the Secretary may prescribe.").  But the Department of Labor has

issued only two such regulations.  *See* 29 C.F.R. § 2510.3-101 (plan assets sometimes include the underlying assets of entities in which a plan has invested); 29 C.F.R. § 2510.3-102 (plan assets include "amounts" contributed to the plan by participants and beneficiaries).

To the extent these two regulations do not cover a particular dispute about whether something is a plan asset, the majority of circuits look to "ordinary notions of property rights under non-ERISA law."  U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993).  *See, e.g., Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) (collecting Department of Labor advisory opinions); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105–06 (2d Cir. 2011) (noting that ERISA's limited definition is not helpful and finding the Department of Labor's property-rights approach persuasive); *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56–57 (1st Cir. 2014) (using the Department of Labor's property-rights approach to determine whether certain funds were plan assets); *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005) (using ordinary notions of property rights to determine that the plan contributions were plan assets because the plan owned a contractual right to them).  *Cf. ITPE Pension Fund*, 334 F.3d at 1014 (analyzing the definition of "acquiring" property without choosing or citing to a specific approach).[3]

---

[3] The Ninth Circuit takes a different approach, asking "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of the plan participants or beneficiaries." *Patelco Credit Union v.*

This definition of property rights includes "any property, tangible or intangible, in which the plan has a beneficial ownership interest." U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at ⋆4 . Identification of plan assets therefore requires "consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved." *Id.* [4]

Neither "ordinary notions of property rights" nor the parties' agreements suggest that the foreign tax credits sought, obtained, and retained by John Hancock were plan assets under ERISA. The Romanos simply did not have a "beneficial ownership interest" in them.

In general, "ownership" is defined as the "bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." Black's Law Dictionary 1329 (12th ed. 2024). It "implies the right to possess a thing, regardless of any actual or constructive control." *Id.* A "beneficial owner" is "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to

---

*Sahni*, 262 F.3d 897, 908 (9th Cir. 2001). Neither party proposes this approach, so we do not address it.

[4] We reject the Romanos' contention that the Department of Labor's property-rights approach also generally includes *"any retrospective rate credits"* based on the fact-specific decision in Advisory Opinion No. 93–14A. *See* Appellants' Br. at 26 (emphasis in original). Those "retrospective rate credits" refer to the specific premium stabilization reserve for the contract at issue in that case, not to "credits" in general.

someone else . . . [especially] one for whom property is held in trust." *Id. See also id.* at 966, 1330 (defining "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing," and "beneficial ownership" as "[a] beneficiary's interest in trust property").[5]

So, for example, "[p]lan assets manifestly include any property held in trust on behalf of the plan." U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4. The Romanos do not contend that the Romano Law Plan has a *pure* ownership interest in the foreign tax credits. As a tax-exempt plan, it is unable to use, manage, or enjoy the credits, and would not be entitled to receive them otherwise. The Romanos concede as much. *See* Oral Argument Audio Recording at 2:30–3:45. *See also* Hayden Adams, *Claiming Foreign Tax Credits*, Charles Schwab (Aug. 12, 2024), https://www.schwab.com/learn/story/claiming-foreign-taxes-credit-or-deduction [https://perma.cc/X7TK-AHLC] ("Because income in a tax-deferred account—such as an individual retirement account (IRA) or 401(k)—isn't subject to U.S. tax (at least not until you begin making withdrawals), you can't deduct foreign taxes paid on investments held in the account."). The tax credits were inalienable and were "owned" by John Hancock as the legal and taxable owner of the shares of the mutual funds in the separate accounts. Nor were the foreign tax credits held in trust for the benefit

---

[5] Other contemporary legal dictionaries contain similar definitions. *See* 2 Bouvier Law Dictionary, Desk Edition 1931–32 (2012); Merriam-Webster's Dictionary of Law 344 (2016).

of the Romano Law Plan. They were simply tax benefits offered by the Internal Revenue Code. That foreign tax credits were the result of foreign taxes on certain funds did not make them assets of a 401(k) plan offered and serviced by John Hancock. *Cf. In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 62 (1st Cir. 2016) (Souter, J.) (rejecting the contention that float interest on sums generated by a participant's withdrawal from a mutual fund constituted a plan asset: "Cash held by a mutual fund is not transmuted into a plan asset when it is received by an intermediary whose obligation is to transfer it directly to a participant. As between the plan and the participant, it is the participant who has the superior claim to property in the cash after redemption. And that is a good reason to reject a claim that the cash should be treated as a plan asset for the purpose of enforcing fiduciary responsibilities under ERISA.").

**2**

The Romanos therefore contend—as they must—that the language in the group annuity contract and the recordkeeping agreement granted the Romano Law Plan a "beneficial interest" in John Hancock's corporate tax credits. We disagree.

"As a general rule, the first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan." *Sec'y of Lab. v. Doyle*, 675 F.3d 187, 204 (3d Cir. 2012). *Cf. ITPE Pension Fund*, 334 F.3d at 1013 ("The proper rule, developed by caselaw, is that unpaid employer contributions are not assets of a fund unless the agreement between the fund and the employer specifically and clearly declares otherwise."). The

Romanos point to language in the group annuity contract stating that "[t]he revenue sharing as well as the *credits* that [John Hancock] receives in respect of an underlying investment vehicle affiliated with [John Hancock] are sometimes generally referred to as 'revenue from the underlying fund.'"  Appellants' Br. at 28 (citing Group Annuity Contract, D.E. 1-1 at 19).  The contract further provides that John Hancock "uses all revenue received from the underlying mutual fund . . . to reduce the [Annual Maintenance Charge] for the Sub-account . . . ."  Group Annuity Contract, D.E. 1-1 at 19.  According to the Romanos, the revenue used to reduce the Annual Maintenance Charge expressly includes *all* "credits" that John Hancock receives—including the foreign tax credits.  But this is not so.

Federal courts "have the authority to develop a body of federal common law to govern the interpretation and enforcement" of plans in ERISA cases.  *See Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016) (citation and internal quotation marks omitted).  Under federal common law, we "first look to the plain and ordinary meaning of the [plan] terms to interpret the contract."  *Id.* at 1307.  A "contract should be interpreted to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous."  *Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) (quoting *Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000)).  When there is an ambiguity, it is construed "against the drafter."  *Alexandra H.*, 833 F.3d at 1307.

The Romanos would have us read the term "credits" in the group annuity contract as an open-ended general term encompassing any kind of imaginable "credit," but when understood in the proper context, the group annuity contract's revenue definition refers to the provision directly above their relied-upon language. In pertinent part, the contract explains that John Hancock receives revenue from the following sources:

> (1) an Annual Maintenance Charge ("AMC");
>
> (2) Sales and Service fee ("SSF"), if applicable;
>
> (3) fees (referred to as "revenue sharing[,]" which includes the asset based distribution charges ("12b-1 fees") or sub-transfer agency fees or other fund fees described above) paid by the underlying mutual fund, trust or other fund related source to us for recordkeeping and other services provided to you by [John Hancock]; and
>
> (4) in the case of an underlying mutual fund, trust, or portfolio attributed with [John Hancock], *credits received by [John Hancock] that are attributable to the investment management fees paid to affiliates of [John Hancock] by such underlying investment vehicle.*

Group Annuity Contract, D.E. 1-1 at 19 (emphasis added). Read as a whole and in the context of its directly preceding provisions, it is apparent to us that the "credits" to be used to offset the Annual Maintenance Charge refer to the credits attributable to the investment management fees paid to affiliates of John Hancock by an

underlying investment vehicle.  The term "credits" does not refer to or include foreign tax credits.  Other than the coincidental usage of the word "credit" in foreign tax credits, we do not see how the Romanos can support their assertion that foreign tax credits fit within the contract's listing of revenue sources.[6]

Because the Romano Law Plan does not have a beneficial ownership interest in the foreign tax credits, those credits were not plan assets under ERISA.  John Hancock therefore had no fiduciary obligations to the Romano Law Plan based on its discretionary authority over such credits.

**B**

The Romanos also contend that, regardless of whether the foreign tax credits constituted plan assets, John Hancock was an ERISA fiduciary because the challenged conduct—the retention of the foreign tax credits—arose from its exercise of discretionary authority over the management and administration of the separate accounts.  We are not persuaded.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Pegram*, 530 U.S. at 226.  As noted earlier, "ERISA recognizes that a person may be a fiduciary for

---

[6] For the same reason, we do not find this aspect of the contract ambiguous.

some purposes and not others." *Loc. Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir. 1987). Sometimes when a service provider has sufficient "control over factors that determine the actual amount of its compensation . . . the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987).

The Romanos' theory is as follows. John Hancock administered and managed the separate accounts that contained sub-account mutual funds. Some of those mutual funds invested in foreign securities and were therefore subject to foreign taxes. The shares of the mutual funds, however, were purchased with assets from the pooled 401(k) plans, such as the Romano Law Plan. So the pooled plans were paying the foreign taxes, while John Hancock received the foreign tax credits. Because John Hancock would not have received the foreign tax credit but for its ownership and management of the separate accounts, it would not be able to "receive" and retain the foreign tax credits. By managing those separate accounts, John Hancock was an ERISA fiduciary with regard to its retention of the value of the foreign tax credits. In short, according to the Romanos, because the foreign tax credits arose from its management of the separate accounts that contain mutual funds with certain foreign investments, John Hancock was an ERISA fiduciary with regard to the foreign tax credits that would not have existed absent the foreign investments. This narrative sounds superficially convincing, but it only tells half the story.

Even assuming that the foreign tax credits constituted "compensation," John Hancock did not have control over the factors that gave rise to them. It is undisputed that the Romano Law Plan and its participants chose which investment vehicles and mutual funds to invest in. It is also undisputed that the Romano Law Plan and its participants chose certain mutual funds that invested in foreign securities. Nobody contends that John Hancock advised or otherwise persuaded the Romano Law Plan and its participants to choose as they did. Indeed, the recordkeeping agreement explains that John Hancock would not have any discretionary authority or responsibility for the management or control of the separate accounts' assets; rather, its authority was limited to holding the assets and allocating them as instructed by the Romanos and the participants of the Romano Law Plan. And John Hancock also has no control over whether it is required to include the foreign taxes as grossed-up income on its U.S. taxes returns; the mutual funds make that decision. *See* 26 U.S.C. § 853.

As the Romanos concede, "[t]he source matters." Appellants' Br. at 41. Here, the source of the foreign tax credits was the Romanos' choice of the foreign investments, not John Hancock's management of the separate accounts. *See, e.g., Cotton*, 402 F.3d at 1279 ("Mass Mutual has never exercised discretionary authority or control over plan management or the administration of plan assets because the decisions to purchase, amend, and borrow against the policies were made by the plaintiffs themselves. Cases holding that insurers like Mass Mutual are not ERISA fiduciaries are numerous.") (collecting cases); *Allen v. Credit Suisse Sec. (USA) LLC*, 895

F.3d 214, 224 (2d Cir. 2014) ("[O]ne factor weighing against the conclusion that the defendant banks controlled the Plans' assets is that the transactions at issue were initiated not by the banks but at the discretion of the Plans' independent investment managers."); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 910 (7th Cir. 2013) (rejecting a fiduciary theory where the funds and share classes included by the service provider on its platform shaped the compensation it would receive, and concluding that the plan sponsor had "the final say on which investment options" would be included); *Consol. Beef Indus., Inc. v. N.Y. Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991) (holding that an insurer was not acting as a fiduciary when, through its agent, it "simply sold . . . annuities" and "did not recommend specific investments beyond its products").[7]

The Romanos also argue that John Hancock became a fiduciary as to the foreign tax credits because the parties' agreements did not explicitly authorize it to retain those credits. They essentially contend that once the foreign tax credits became available to John Hancock, it had discretion to give the plans a commensurate monetary benefit—and that discretion operated to create fiduciary status over retention of the credits.

---

[7] The Romanos also insist that John Hancock "has complete control over the disposition and management of the [foreign tax credits]," and therefore, because its relationship with the Romano Law Plan gives its complete control over the foreign tax credits, it must be a fiduciary with respect to those credits. But this theory presupposes that the credits are plan assets, which, as discussed, they are not.

We decline to create fiduciary status based on non-existent contractual provisions about non-plan assets.  We agree with the district court that the application of foreign tax credits on its own tax filings did not give John Hancock discretion over *plan management*.  *See, e.g., Lanfear*, 679 F.3d at 1283–84 (concluding that the defendants were not ERISA fiduciaries when they filed inaccurate SEC statements and prospectuses, because when doing so "they were acting in their corporate capacity and not in their capacity as ERISA fiduciaries"); *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991) ("[P]lan administrators assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.") (internal quotation marks omitted).  *Cf. Ret. Plans Comm. of IBM v. Jander*, 589 U.S. 49, 54–55 (2020) (Gorsuch, J., concurring) ("Because ERISA fiduciaries are liable only for actions taken while 'acting as a fiduciary,' it would be odd to hold the same fiduciaries liable for 'alternative action[s they] could have taken' *only* in some other capacity.") (internal citations omitted).

John Hancock was not an ERISA fiduciary with regard to its application and retention of the foreign tax credits.  Because fiduciary status is a prerequisite for both of the Romanos' claims—the claim for breach of fiduciary duty and the claim for engaging in a prohibited transaction—those claims fail as a matter of law.

## V

The district court correctly granted summary judgment in favor of John Hancock on the merits.  Although the district court

erred in holding that the Romanos and the plans lacked Article III standing, we agree that John Hancock was not an ERISA fiduciary for the challenged conduct, i.e., the application and retention of the foreign tax credits.

**AFFIRMED.**